315 So.2d 1 (1975)
Sylvester Lavon EVANS
v.
STATE of Mississippi.
No. 48388.
Supreme Court of Mississippi.
May 19, 1975.
As Amended on Denial of Rehearing July 14, 1975.
*2 Maxey, Clark & Casey, Laurel, for appellant.
A.F. Summer, Atty. Gen. by Wayne Snuggs, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before GILLESPIE, C.J., and ROBERTSON and SUGG, JJ.
ROBERTSON, Justice, for the Court:
Sylvester Lavon Evans was indicted, tried and convicted in the Circuit Court of the Second Judicial District of Jones County of manslaughter in the killing of Marvin Suttle, Jr. He was sentenced to serve a term of fifteen years in the Mississippi State Penitentiary. He contends on appeal that the trial court made 10 errors during the trial.
About 10 o'clock P.M. on August 27, 1973, after talking with his recently divorced wife, Mrs. Mary Evelyn Evans, appellant drove to his ex-wife's home on North 11th Avenue in Laurel, ostensibly to see his children. As he drove south he noticed an automobile on the west side of the street headed north with its headlights on. He parked his pick-up truck behind this automobile, got out and walked toward the fence gate next to the sidewalk. Marvin Suttle, Jr. called to him from the driver's side of the parked automobile. Appellant testified that as he approached the car, Suttle stuck a sawed-off shotgun through the car window and threatened to kill him. Evans grabbed the shotgun by the barrel and pulled it away from Suttle. In the ensuing struggle over the shotgun, the stock was broken and Evans struck Suttle, apparently through the car window, at least five or six times with the shotgun. Evans further testified that Suttle was trying to get out of the car, and that he could have hit him fifty to a hundred times. Roger Bankston, Mrs. Evans' next-door neighbor, heard a popping sound a number of times and looked out the window. He saw the opened car door, Suttle on the ground, and Evans hitting him with a shotgun. Evans walked away from Suttle three times and came back each time and poked or nudged him as he lay on the ground doing nothing. Evans threw the shotgun and the broken stock in the back of his pickup truck and drove off.
Bankston called the police and told them "there was a man badly beaten and possibly dead on North 11th Avenue there." Jerry Hutcheson of the Laurel Police Department was the first to arrive on the scene. He arrived about 11:00 P.M., found Suttle lying on the ground on his back, partly in and partly out of his Chrysler. The door was open on the driver's side and Suttle's right foot was underneath the pedal of the emergency brake. Hutcheson immediately checked for a pulse or heart beat. He found neither and called police headquarters.
Detective Captain Segrest arrived, found the body which was bloody and appeared to have been beaten, secured the area, and had his men take pictures and measurements. On the passenger side of the front seat was blood and what appeared to be fragments of bone and teeth.
Evans was picked up at his trailer home, brought to police headquarters, explained *3 his rights in the presence of his attorney, and thereafter made a full statement of what happened.
Suttle's body was taken to the Charity Hospital in New Orleans on August 29, 1973, and at the request of the coroner of Jones County, Dr. Monroe Samuels, the Director of Laboratories at Charity Hospital and also Chief Consultant to the Orleans Parish Coroner's Office, performed an autopsy on Suttle. Dr. Samuels explained his findings:
"Very briefly, the man had sustained multiple blows to the head and face and by some instrument that had a rounded rather sharp edge to it, and he had multiple areas of lacerations to his face and extensive laceration of his lips and multiple fractures of the jaw bone, and in addition to that he apparently had aspirated a large amount of blood, because blood was found throughout his entire breathing passages all the way out to the periphery of the lungs."
......
"The exact cause of death in this individual was the massive aspiration of blood, secondary to the extensive fractures of the jaw."
......
"Q Doctor, these fractures that produced bleeding and resulted in aspiration, if these fractures had occurred earlier would this deceased have been able to eat in the condition he was in?
"A No, sir."
......
"He would not have been able to speak, or eat. I doubt he would have had any jaw movement at all."
Appellant first contends that he was deprived of a fair and impartial trial because the regular district attorney recused himself and a special district attorney was appointed by the court to prosecute for the State. This assignment of error is without merit. It was within the sound discretion of the trial court to allow the regular district attorney to recuse himself and there is an order in the record appointing "the Honorable Maurice Dantin, a qualified Attorney at Law and District Attorney for the Fifteenth Judicial District for the State of Mississippi" to act as district attorney and to prosecute for the State.
No objection was made during the trial or at any other time to the special district attorney representing the State. This assignment of error was answered adversely to the contentions of the appellant in Wilson v. State, 234 So.2d 303 (Miss. 1970); and in Fairley v. State, 163 Miss. 682, 138 So. 330 (1931).
Assignment of error number 2 is without merit.
Appellant argues in assignment 3 that the court erred in refusing to permit proof of Suttle's general reputation for peace and violence and for the carrying of a gun. The truth of the matter is that the court did allow two witnesses to testify as to Suttle's general reputation for peace and violence. John Avary Jr., called as a witness by the defendant, testified:
"Q And do you know his general reputation in the community in which he resided with reference to peace and violence?
BY MR. SULLIVAN:
If the Court please, we object to that as not being properly predicated.
BY THE COURT:
Overruled.
BY MR. SWARTZFAGER:
Q Do you know?
A Well yes, I do.
Q And is it good, or is it bad?
A I would consider it to be very bad.
BY MR. SWARTZFAGER:
That's all."
*4 Melvin Davis, called as a witness by the defendant, testified:
"Q And I will ask you whether or not from your observation and from living the same general community that Mr. Suttle resided in, if you know his reputation for peace and violence?
A Yes, sir.
Q And I will ask you if you do know it, is  his reputation for peace and violence, is it good or is it bad?
A I would say bad."
It is true that the court did not allow Lampkin Butts, Suttle's attorney, to testify as to the deceased's general reputation for peace and violence:
"BY MR. SWARTZFAGER:
Q All right, do you know his reputation in his community with reference to whether he was peaceful or a violent person?
BY MR. SULLIVAN:
If the Court please, we object to that as not having been properly predicated up to this point.
BY THE COURT:
Sustained."
We note that defense counsel immediately went off on another tack and did not make a record of what he intended to prove by this witness.
Roger Dale Bankston, a witness called by the State, on cross-examination answered the question about the deceased's general reputation for peace and violence in this way:
"A I really never knew anything that he did violent, except for the fight he was in that night. I knew of him and what he was, and I guess so; yeah.
Q You knew of him and what he was? What do you mean by that?
BY MR. SULLIVAN:
If the Court please, we object.
BY THE COURT:
Sustained."
Again there was no offer of proof, and defense counsel shifted to another subject.
This colloquy took place between defense counsel and Jimmy Short, called as a witness by the defendant:
Q All right, sir. Do you know the general reputation in the community in which he resided for peace and violence?
A Yes, I do 
BY MR. SULLIVAN:
 we object on the basis of not being properly predicated.
BY THE COURT:
Sustained.
BY MR. SWARTZFAGER:
Q All right, Mr. Short, from having seen Mr. Suttle once or twice a week for several months before this incident occurred, do you know of your own knowledge whether or not Mr. Suttle had communicated any threats against this defendant over here, Mr. Evans?
A Yes, I do.
Q And do you know whether or not you advised Mr. Evans about these threats?
A Yes, I did.
Q Did you, sir?
A Yes, sir.
BY MR. SWARTZFAGER:
That's all."
It is clear to us that Bankston did not know deceased's general reputation for peace and violence in the community in *5 which he lived and the trial court was correct in not allowing him to testify along this line.
Two of the defendant's witnesses, Avary and Davis, were allowed to testify and only one defense witness, Short, was turned down, but even Short was allowed to testify, without objection, as to threats made by the deceased and communicated to the defendant.
Under the circumstances, we feel that no harmful error was committed by the trial court in its rulings on this matter of general reputation for peace and violence.
Appellant next contends that the court erred in sustaining objections of the State to testimony of the defendant as to what kind of threats were made against the defendant by the deceased. The court allowed the defendant to testify as to the names of those who had communicated threats to him, but did not allow the defendant to go into the details of an extended conversation that Evans had had with a bartender. The court was correct in its ruling.
Appellant complains that the City of Cleveland arrest record of the deceased was improperly excluded. It was admitted for identification and we have carefully examined it. Besides being merely an arrest record, the arrests back in 1963 through April, 1969, would be entirely too remote to have a bearing on this case. The court was correct in excluding it.
Appellant complains of the court's refusal to grant defendant's instruction number 1. This was an abstract instruction attempting to define assault. The gist of this instruction was included in a specific instruction granted the defendant, so this instruction was duplicitous and the court was correct in refusing it.
Appellant contends that the trial court erred in refusing his instruction number 9. This instruction was a comment on the weight and worth of the evidence. Such an instruction is prohibited by Mississippi Code Annotated Section 99-17-35 (1972). It was properly refused by the trial court.
Appellant complains of the granting of State's instruction number 3. There is nothing wrong with this instruction. Also the appellant made no specific objection and stated no particular ground for his objection. Rule 42 of this Court states, among other things:
"It is, therefore, the rule of this Court that no assignment of error based on the giving of an instruction to the jury will be considered on appeal unless specific objection was made to the instruction in the trial court stating the particular ground or grounds for such objection." [Emphasis added].
Appellant next argues that the granting of State's instruction number 7 was error in that there was no evidence in the record to support this instruction. We have carefully read the record and there is evidence in the record justifying the granting of such an instruction. The trial court was correct in granting this instruction.
There is no merit in assignment of error number 10.
The conviction and sentence are affirmed.
Affirmed.
RODGERS, P.J., and PATTERSON, INZER, SMITH, WALKER and BROOM, JJ., concur.