390 So.2d 575 (1980)
Emory M. WILSON
v.
STATE of Mississippi.
No. 51869.
Supreme Court of Mississippi.
June 4, 1980.
As Modified On Denial of Rehearing December 3, 1980.
*576 Holleman & Krogstad, Boyce Holleman, Louis Guirola, Jr., Gulfport, for appellant.
Bill Allain, Atty. Gen. by Billy L. Gore, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before SMITH, P.J., and BROOM and COFER, JJ.
BROOM, Justice, for the Court.
Armed robbery conviction and sentence of twenty years imprisonment resulted from trial of the defendant Emory M. Wilson in the Circuit Court of Forrest County. His defense, refused by the jury, was that he participated under "duress."[1] Wilson appeals contending that the lower court committed reversible error as to (1) evidentiary rulings, (2) severity of the sentence, (3) refusal of a jury instruction, and (4) he asserts that his trial counsel was neither competent nor effective. We affirm.
According to the testimony, the defendant Wilson (either alone or acting jointly with others) robbed three U.S. Army Reserve Officers of approximately $27,000 cash payroll money which they were about to pay to Army Reserve students at the University of Southern Mississippi (USM). Wilson had previously commanded a school conducted for the military on the USM campus. The officers had brought the money from Camp Shelby and had proceeded to Elam Arms Dormitory, USM. While getting out of the car, the officers heard a voice say, "Don't you go in there. Don't you go in there." Then observed by the officers was a man, with a rifle pointing at them, who stated, "I have two other men behind the fence with shotguns. I want you to put the bags down and go inside the building and lay face down on the floor." None of the officers were subsequently able to identify the man's face, because he was wearing a "ski mask" or "navy watch cap" over his head. The officers left the money on the pavement, went inside the Elam Arms Dormitory and lay face down on the floor as they were ordered to do. After hearing a sound like a chain going through the door handle, and waiting a short time without hearing anything else, they ran to the door which they found locked. They promptly notified the authorities and an investigation began.
Wilson, a Colonel in the Army Reserve, was subsequently implicated and jailed in Fulton County, Georgia from where he waived extradition. According to Wilson, his involvement in the robbery came about in a most unusual manner. He states that in 1977, he was given a telephone number of a man named Blake Brown, who "loaned money at high rate interest". Wilson called Brown, and after several meetings with Brown in the Atlanta, Georgia area, obtained a $3,000 loan from him. Wilson's introduction to Brown came through a woman known only as Linda (she did not testify), with whom Wilson admitted having had an affair.
Further testimony of Wilson (though rejected by the jury) is summarized as follows. In July of 1978, when he had not repaid this loan, Brown ordered him to come to Hattiesburg, Mississippi from Indiantown Gap, Pennsylvania. Because Brown threatened to burn his business and threatened Wilson's wife and children, Wilson came to Mississippi and met Brown in Hattiesburg as instructed. There Brown beat him up and threatened him further, after which another man known to him only as "John" joined them. Detailed plans were made by Brown and John pursuant to which the three of them (Wilson driving) proceeded to Elam Arms where Wilson remained in the car with Brown while John went some place. John shortly came back, jumped in the back seat, and they all left.[2] *577 After driving down a road, they stopped at a dead end where the other two men fled thinking a police car was coming. Wilson then found in his car the money taken in the robbery, and headed back to Georgia as instructed. At Andalusia, Alabama he stopped for gas and discovered a rifle, which he had not previously known was there, on the back seat of the car.
Wilson stated that this rifle was an M1-30 carbine which he had at one time owned. He sold the rifle to Blake Brown for $800, and when told the going rate for such a rifle was $114.95, he said that he thought it strange Brown would pay such a price, but took the money anyway.[3]
Upon arrival in Atlanta, he went to the Alamo Plaza Motel and registered as instructed in the name of James Brown. He hid the money behind a restaurant but subsequently surrendered to authorities, and turned in the money, and within a day or two was back in Mississippi. Other testimony will be stated where appropriate herein.
Wilson asserts that he was denied due process of law when the lower court excluded certain testimony consisting of threats communicated to him. While testifying, Wilson was asked to repeat what one of the other two alleged participants in the robbery said to him as a direct threat, but the prosecutor's objection (hearsay) was sustained. The following example is excerpted from the record of Wilson's testimony:
BY MR. CONNER: Please tell the jury the threats as it pertained to your life, of exposure of your infidelity, or danger to your family or whatever it was that made you come to a rendevous ... Colonel, I want you to state exactly what the man said to you verbatim.
BY MR. PHILLIPS: Objection, Your Honor.
BY THE COURT: Sustained.
BY MR. WILSON: The man, he was evidently in a rush. He came up to me and wanted to know, "Where in the world, you S.O.B., where in the world you been?" And I said, "What do you mean?" and he said, 
BY MR. PHILLIPS: Objection, Your Honor.
BY THE COURT: Sustained.
Suggestive and leading aspects of the query are obvious but were not basis of the objection. Wilson's contention is that in sustaining the prosecution's objection, the trial court denied him his rights guaranteed under the Fourteenth Amendment of the United States Constitution, which states in part:
nor shall any State deprive any person of life, liberty, or property without due process of law.
Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) is relied upon in support of Wilson's contention that hearsay testimony critical to his defense, may not be mechanistically excluded to defeat the ends of justice. Chambers is patently distinguishable from the case at bar because in the present case there was no other corroborating evidence as to the alleged statements made to Wilson by Brown, who was not available for cross-examination by the state. Additionally, Chambers had in it the element of declaration against interest but here it cannot be said that the threats which Wilson sought to introduce constituted declarations against him.
Argument is made that the testimony of detailed threats made to Wilson would have shown his reasonable apprehension of danger or state of mind under Harley v. State, 345 So.2d 1048 (Miss. 1977) and Evans v. State, 315 So.2d 1 (Miss. 1975). In Harley, we stated that:
It was fatal error to exclude this testimony because it was offered not for the truthfulness of the threats but merely to show the apprehensive state of mind of *578 the defendant at the time of the fatal encounter.
(345 So.2d at 1050).
Handshoe et al. v. Daly et al., 211 Miss. 189, 51 So.2d 230 (1951) held that:
This testimony was admissible as an independently relevant fact to explain the circumstances under which these particular claimants furnished the materials for which they were claiming, and the truth or falsity of Handshoe's quoted statement was not a fact in issue, and hence the hearsay rule does not apply. (211 Miss. at 193, 51 So.2d at 232).
In resolving this issue, we are mindful that Wilson was allowed to fully explain to the jury that he was at all times during the commission of the armed robbery "covered with a shotgun", and in awesome fear of the other two alleged participants in the robbery. Also, he was allowed to describe in great detail that his business had been threatened, his children had been threatened, and he himself had been threatened over the telephone when Blake Brown called him. Actual statements made by the other two participants in the armed robbery would have been cumulative of an abundance of testimony heard by the jury as to duress. Wilson was liberally allowed to present his defense of duress to the jury and relate to them that he was at all times during the course of the robbery in fear of his life, and fearful of other threatened calamities. It is noted here that Wilson (in response to a telephone call) placed himself in the hands of the other two participants in the armed robbery without making any attempt to invoke the aid and assistance of the authorities in any state from Pennsylvania to Mississippi. Also, he had ample opportunity to contact the Mississippi and/or Georgia authorities after the commission of the robbery but elected not to do so, although he did eventually surrender the money to the Army at Fort McPherson, Georgia. Harley, supra, did not say and does not mean that reversible error occurs every time testimony of this type is excluded. Exclusion here resulted in a large measure from sustaining objections to questions which were both leading and quite suggestive of answers. Again, as noted above, the defendant was allowed to freely testify time and again that threats against his children, his business, his life, and to expose his acts of infidelity were made prior to the robbery. Further, he testified that at all times during the actual commission of the robbery a shotgun was poked in his side, with Blake Brown's finger on the trigger. According to Wilson's testimony which the jury heard, it is obvious that at all times he claimed to be acting in response to mortal fear for his life, family, and property. Indeed, after the robbery when the three went back to the van and then went down the dead end street where he was left with the money and the gun, he was afraid he was going to "get his brains blown out."
Upon the testimony, exclusion of the actual statements made by Blake Brown was error but does not require reversal, because the record demonstrates beyond a reasonable doubt that the error had no effect upon the outcome of the trial. Heard by the jury was abundant and repeated testimony on Wilson's theory that he was not a voluntary actor. With the great amount of testimony and evidence as to the defense of duress, which went to the jury, the actual statements claimed to be made by Blake Brown to Wilson before, during and after the robbery were cumulative of other testimony and not essential to the defendant's case.
Wilson also contends that the following exchange which took place at the trial was a fatal blow to his right to a fair trial and due process of law. The exchange referred to is as follows:
BY MR. CONNER: Colonel, I'm going to ask you a question. Did you voluntarily participate in that robbery?
BY MR. WEATHERS: Objection, Your Honor. That's improper. That's for this jury to determine.
BY THE COURT: Sustained.
BY MR. CONNER: Did you plan that robbery?
BY MR. WILSON: No sir.
BY MR. WEATHERS: Objection, Your Honor. Same reason.

*579 BY THE COURT: Sustained. Jury, you'll disregard the response to that question. The record will be stricken of that response.
Wilson contends this was fatal to his case because the trial judge by his actions told the jury to "disregard his response" meaning that the jury should disregard the defendant's denial of guilt. This is simply not the case because what the judge said could not logically have been accepted by jurors as instruction to disregard Wilson's acting under duress. Moreover, a later exchange on cross-examination was in mitigation of the matter. The later exchange was:
Q. [BY COUNTY ATTORNEY PHILLIPS]: Truth of the matter is, Colonel, that you pulled that robbery, knew you were caught, and you did everything in your power after you found out they had you to cover it up, just like you're covering it up today, didn't you Colonel?
A. No, sir.
BY HON. DUDLEY W. CONNER: If Your Honor please, I can't hear the question.
BY HON. GEORGE L. PHILLIPS: No further questions.
BY THE COURT: You may repeat the question, counsel. He didn't hear it.
Q. I said the truth of the matter is that you pulled the robbery and you found out you were caught and then you started doing everything in your power to cover your tracks from day one, just like you're sitting up here doing today, isn't it, Colonel?
A. No, sir, and I've told you that since I've been here.
This exchange on cross-examination emphasized to the jury that Wilson denied his guilt, and would again re-emphasize the fact that he claimed his actions resulted from duress. Therefore, this particular aspect of Wilson's argument does not merit reversal.
Next Wilson argues that the lower court erred in refusing to allow into evidence parts of a deposition of one of defendant's witnesses taken before trial. On October 26, 1978, the witness, Mrs. Lillie Curry, was deposed in Andalusia, Alabama, in the presence of Wilson's counsel and the Forrest County Prosecutor. In the deposition was a provision that "each party reserves the right to offer all or any part thereof of the deposition for evidence at the trial... ." On the third day of the trial the court was first made aware of the deposition at which time it was stated that Mrs. Curry had cancer and belonged to a "cult" which didn't believe in the taking of medication. Upon the record as made we find beyond a reasonable doubt no reversible error in the refusal of the court to admit the deposition into evidence, especially since the deposition contained inadmissible testimony.
Exactly why Mrs. Curry was not available to testify in person at the trial was not clearly revealed by the record. She was not subpoenaed to appear before the trial and no effort to procure her presence was made under our Uniform Witness Attendance Law: Mississippi Code Annotated § 99-9-27, et seq. (1972). Early in our jurisprudence in Dominges v. State, 15 Miss. (7 Smedes & Marshall) 475 (1846) we spoke on the subject of depositions and said:
The system of criminal jurisprudence appears to require the presence of the witnesses, both for and against the accused. Very often, in such prosecutions, much depends upon the appearance, manner and mode of testifying of a witness, and it is this that adds the superior character and importance to oral testimony.
The practice in criminal cases of proposing to admit what was expected to be proved by absent witnesses, is not calculated to advance the ends of public justice; and if indeed regular and competent, should not be allowed or encouraged except in very extreme cases.
(15 Miss. at 477, 478).
Contained in Mrs. Curry's deposition was testimony that she remembered Col. Wilson stopping at her gas station to purchase gas in Alabama on the date of the robbery. She stated that after Wilson left or as he *580 was leaving, a dark colored van containing two men pulled up to get gas but we note that she was unable to identify either of them. Upon the record as made, we find no reversible error in the lower court in the trial judge's refusing to accept her deposition into evidence especially where it is not likely that admitting the deposition into evidence would have resulted in a different verdict from that returned.
Next argued on behalf of Wilson is his contention that he was denied due process of law in that he was not represented by competent and effective counsel. The record shows Wilson was represented by a member of the State of Georgia Bar and by the Hon. Dudley W. Conner, an outstanding member of the Mississippi State Bar  these men were retained counsel, not court appointed. We stated in Miller v. State, 231 So.2d 178 (Miss. 1970) that "An accused who retains his own attorney waives his right to complain of his counsel's competency. King v. State, 374 So.2d 808 (Miss. 1979) held that a defendant in a criminal case on appeal "may not here complain that he was not properly represented" where it appears at the trial level he had counsel of his own choice. Looking at the record on the case as a whole, our opinion is that Wilson was fairly and vigorously defended. The record does not show that the conduct of Wilson's trial counsel was so lacking in diligence and competence as to reduce the trial to a farce or a mockery, nor could it shock the conscience of the court.
Another assertion made on the appeal of Wilson is that the lower court erred in imposing a 20-year sentence because the sentence was excessive and not reasonably calculated to be less than life. Under the applicable statute, conviction could have carried with it a sentence of life imprisonment, if imposed by the jury. Wilson argues that he is approximately 50 years old with a 22-year life expectancy and therefore his sentence is not reasonably expected to be less than a life sentence. We held in Stewart v. State, 372 So.2d 257 (Miss. 1979) that:
Upon remand, the trial court will make a record of and consider all relevant facts necessary to fix a sentence for a definite term reasonably expected to be less than life. The court should consider the age and life expectancy of the defendant and any other pertinent facts which would aid in fixing a proper sentence.
(372 So.2d at 259).
In the case now on appeal here, it is obvious to us that under Stewart, supra, the trial judge considered "other pertinent facts which would aid in fixing a proper sentence." In handing down the sentence, the sentencing judge noted that Wilson's attitude was not that of one who felt "sorry for the things he's been involved in." It is also obvious that the sentencing judge considered the fact that Wilson's alleged principals: Blake Brown or the man known as John, had not been brought to justice. Wilson appears to be the only person introduced in the trial who could have supplied information about the other two. We are unable to say that the sentence at issue is unduly excessive or that it violates our established standards.
Last argument made is that the court erred in refusing to grant one of the jury instructions (D-3 requested by Wilson). The reason stated below by the trial court in refusing to grant D-3 was that it had already granted D-5, which the court felt was inclusive of the substance of D-3. Careful reading and scrutiny of the two instructions reveal that they are based on "substantially the same theory" and therefore the trial judge did not abuse his sound discretion in rejecting D-3.
Looking at the record as a whole, along with very excellent briefs and oral arguments, we perceive this case as one where the accused did not get a perfect trial, but did get a fair trial which lacked any grievous or prejudicial error. His defense of duress was founded upon activities of the other two mysterious principals in the crime and a female named "Linda", none of whom appeared at the trial and testified. The jury, as it had a right to do, rejected Wilson's theory of the case and we cannot say *581 that reversible error is demonstrated in the record.
AFFIRMED.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, LEE, BOWLING and COFER, JJ., concur.

ON PETITION FOR REHEARING
WALKER, Justice, dissenting:
I must respectfully dissent from the holding of the majority which affirms a twenty-year sentence, without benefit of probation or parole,[1] imposed by the Circuit Court of Forrest County upon Emory M. Wilson. Such a severe sentence is ordinarily imposed upon criminals who have caused bodily harm, injury or death to someone during the perpetration of a crime. The real magnitude of the sentence can only be fully appreciated when it is understood that this defendant was not allowed to fully, completely and adequately present his defense to a jury, a right guaranteed to every defendant by the Constitutions of the United States and the State of Mississippi. The Constitutions guarantee to every accused the right to a fair trial before his freedom may be taken from him. No man is entitled to a perfect trial, but if the lack of perfection rises to the point of causing the trial to be unfair, then the cause should be reversed and the accused given an opportunity to present his case to another jury. It is in this regard that reversible error, in my opinion, was committed in this case. By no valid rationalization or legalistic reasoning can I bring myself to the conclusion that the errors admittedly committed[2] were harmless beyond a reasonable doubt as that term has heretofore been defined by the United States Supreme Court.
The law is well settled, and in fact it is conceded by the Attorney General, that if a person commits a crime at the direction of another and as a result of threats to his life and/or serious physical abuse to his person, such individual is not to be held accountable for his involuntary act.[3] This was the defense asserted by the defendant, who claims that he participated in the armed robbery only because of and as a direct result of threats upon his life and the well being of his children and his business.
He freely admitted his role in the crime, but sought to prove he had no choice. Because of erroneous evidentiary rulings below his efforts to fully present the facts on which he based his sole defense were continually frustrated. A defendant has a legal right to have the jury consider his sole defense and an error which denies him that right is substantial, not harmless.
Evidence of the communication of threats to Wilson was admissible, not for the purpose of proving the validity of such threats, but for the purpose of showing the state of mind of the defendant and why he acted in a particular way. Statements offered for any reason other than to prove the truth of the facts asserted are simply not hearsay.[4] This Court has held that the exact words of a threat are of such importance and so crucial to a defendant's claim of self-defense that to refuse to permit their introduction into evidence constitutes reversible error.[5] It follows that statements the defendant sought to introduce in this case were admissible to show the effect they had on him. It is true that the jury was aware *582 that the defendant had a shotgun pointed at him during the commission of the crime. However, the jury may not have appreciated the full meaning and import of Wilson's having a shotgun pointed at him without hearing what the shotgun holder said he would do if his orders were disobeyed. In this case each time the defendant attempted to inform the jury what his captors threatened would happen to him if he did not obey the commands, the State interposed an objection, which was sustained by the trial court, and the defendant was admonished that such testimony was inadmissible in evidence. Even the defendant's own counsel, who was attempting to abide by the rulings of the court, although erroneous, told the defendant not to repeat what was said to him. Fortunately, however, in the defendant's frustration to tell the complete story, he blurted out one of the many threats[6] he received from his captors minutes before the armed robbery took place, or this record would be devoid of the vicious character of his captors and the mentally debilitating situation the defendant was in. Colonel Wilson stated, "He was threatening my life, and he told me that he was going to blow my head off if I didn't cooperate." When the defendant blurted this threat out there was an immediate objection by the prosecuting attorney which was sustained by the trial court who promptly admonished the jury to disregard the response. The trial court's admonition to the jury, in my opinion, effectively told them that the threats made upon this defendant's life were irrelevant to the trial of the case and should be disregarded by them.
I am of the opinion that the error was so grave, the issue so crucial and the consequences so drastic that this Court cannot, in good conscience, say that this error did not in any way or in any manner influence the jury in its final determination, beyond a reasonable doubt.
The majority opinion refers to the "alleged participants" as if there were no corroboration of their existence, when, in fact, the very police woman who followed the defendant's automobile after it left the site of the armed robbery and who noted the tag number of the vehicle testified that there were three people in the vehicle. This testimony was not contradicted and is not unreasonable or in any way inconsistent with the defendant's testimony, or that of the victims.
The undisputed facts, leaving aside the disputed issues, belie any suggestion that Wilson's conduct was the voluntary act of a rational man-yet there is not a scintilla of evidence that the defendant was not completely rational and intelligent. I suggest that a rational man would not concoct such a scheme voluntarily, with its inception beginning in Pennsylvania, a drive of approximately seventeen hours from Hattiesburg, and ending several hours later in Atlanta. An intelligent man, such as the defendant, would know that his absence over such an extended period of time from his office and home would be enough in itself to arouse someone's suspicion or interest as to his whereabouts. This fact renders suspect the contention that he voluntarily entered into this situation.
The defendant is an ex-veteran with twenty-nine years of service in the Army Reserves, presently holding the position of Colonel and Commandant of his unit. Certainly, he knew that to voluntarily commit such an offense against the Army Reserve unit in Hattiesburg would subject him to a dishonorable discharge and the loss of any benefits which have accrued during his service in the Reserves. Moreover, he is a family man with a wife and three children, is a deacon in his church and is actively engaged in civic affairs in his community. At the time this offense was committed he had three going furniture stores and there was no proof or indication that any of them were in serious financial trouble.
*583 I make no judgment on Wilson's guilt or innocence, but the facts of this case disturb me deeply. I am convinced that, since this defendant was not allowed to fully and completely present the defense to which the law entitles him, he did not receive a fair trial and the petition for rehearing should be sustained and this cause remanded for a new trial.
PATTERSON, C.J., SMITH, P.J., and BOWLING, J., join in this dissent.
NOTES
[1] Duress is a valid defense for many crimes including robbery; Homicide is an exception. Watson v. State, 212 Miss. 788, 55 So.2d 441 (1951).
[2] A light colored station wagon occupied by three people was observed leaving the area by a law officer who wrote down the license tag number  investigation disclosed the vehicle was that of Wilson.
[3] Although Wilson claimed to have been threatened with a shotgun during the whole period of the robbery, no shotgun was left in the car, only the rifle. Brown and "John" apparently took the shotgun but left the money and the rifle.
[1] Mississippi Code Annotated section 47-7-3(d) (Supp. 1980) mandates that he serve a minimum of ten years before he will be eligible for parole. The trial court was without authority to remove from Wilson all rights of parole or probation.
[2] The majority opinion and the Attorney General concede that the trial court committed error in not admitting the defendant's testimony as to the actual threats on him.
[3] This defense is discussed in one of the more notorious cases of our time, United States v. Hearst, 563 F.2d 1331 (9th Cir., 1977).
[4] Anderson v. United States, 417 U.S. 211, 219, 94 S.Ct. 2253, 2260, 41 L.Ed.2d 20 (1974); Giblin v. United States, 523 F.2d 42, 45 (8th Cir., 1975); United States v. Carter, 491 F.2d 625, 628 (5th Cir., 1974).
[5] Leverett v. State, 112 Miss. 394, 73 So. 273 (1916); Clark v. State, 123 Miss. 147, 5 So. 188 (1920).
[6] The defendant points out 20 examples in the transcript of objections to his testimony which were sustained. At least seven of the objections concerned what was said to Wilson by his captors before, during and after the robbery. The example in the text is the only time Wilson was able to answer before an objection was made and sustained.