# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-KA-00552-SCT

*BRANDY NICOLE WILLIAMS a/k/a BRANDY*
*WILLIAMS a/k/a BRANDY N. WILLIAMS*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 03/18/2016 |
| TRIAL JUDGE: | HON. RICHARD W. McKENZIE |
| TRIAL COURT ATTORNEYS: | TONY LAWRENCE |
| | CHERIE R. WADE |
| | ANDRE de GRUY |
| | VICKI GILLIAM |
| COURT FROM WHICH APPEALED: | GEORGE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: JUSTIN T. COOK |
| | GEORGE T. HOLMES |
| | ANDRE de GRUY |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LAURA H. TEDDER |
| DISTRICT ATTORNEY: | ANTHONY N. LAWRENCE, III |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 09/21/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**BEFORE RANDOLPH AND KITCHENS, P.JJ., AND CHAMBERLIN, J.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1. On March 18, 2016, a George County jury convicted Brandy Williams of the capital murder of Sheriff Garry Welford. The George County Circuit Court sentenced Williams to life without the possibility of parole in the custody of the Mississippi Department of

Corrections. Williams now appeals. She argues that the trial court committed reversible error by not quashing her indictment, improperly instructing the jury and admitting evidence of Williams's prior crimes. After review, we affirm.

**STATEMENT OF THE FACTS**

¶2. Williams lived primarily in George County before July 21, 2010. She and Christopher Baxter had been dating since the fall of 2009—a fact that was known throughout the law enforcement community of George County. George County Deputy Bobby Daffin claimed that he never saw Baxter without seeing Williams and never saw Williams without seeing Baxter. Williams and Baxter regularly lived in her father's trailer together, and Williams often drove her father's maroon Chevrolet Z71 truck (the "Z71").

¶3. On April 26, 2010, Baxter pleaded guilty in the Circuit Court of George County to the manufacture of methamphetamine; the court continued his sentencing until July 19, 2010. Williams admitted that she knew Baxter had pleaded guilty in court and that he would have to go back to jail.[1]

¶4. Williams also had a prior criminal record; she had been indicted for two separate counts of grand larceny in November and December of 2008. Williams had enrolled in a pretrial diversion agreement in the Jackson County Circuit Court on July 15, 2010—only six days before Sheriff Welford was killed. One of the conditions of her participation in the pretrial diversion program was to "avoid persons . . . of disreputable or harmful character."

---

[1]Williams's grand-jury testimony was entered into evidence at trial by the State.

***Monday, July 19, 2010***

¶5.     On Monday, the day of Baxter's sentencing, Baxter left Williams's residence around 9:15 a.m. in his Sonoma.  Williams alleged that Baxter told her that he was going to court. Baxter never appeared in court though, and a bench warrant was issued for his arrest. Around 12:45 p.m., George County deputies arrived at Williams's residence, and Williams told them that Baxter had left that morning to go to court.  Williams stated that she did not see Baxter again until Wednesday, July 21, 2010.

¶6.     Rita Butler, Williams's next-door neighbor, admitted that on Monday morning Williams knew that Baxter "hadn't turned himself in . . . .  So, yeah, she knew at that time that he had not and he was running from the law."  Butler also testified that Williams had told her on Monday that she was through with Baxter.

***Tuesday, July 20, 2010***

¶7.     Robin Howell, Baxter's aunt, testified that Baxter arrived at Howell's house on Tuesday evening, driving the Z71.  Further, she testified that Williams and Baxter left her home together that evening in the Z71.

***Wednesday, July 21, 2010***

***Before the Pursuit***

¶8.     Williams alleged that on Wednesday morning she was at Baxter's father's house while Baxter's father repaired the Z71's brakes.  She stated that Baxter drove up in his truck before noon and asked her to drive him into town to get some screws for his truck.  Williams maintained that this was the first time that she had seen Baxter since he left her house on

3

Monday morning to go to court. She agreed to drive Baxter into town in the Z71 and admitted that she knew that the police were looking for him. Williams claimed that she had told Baxter on the way into town that she wanted to break up, mentioning that she had just entered the pretrial diversion program.

¶9. According to Williams, she drove Baxter to the Walmart and entered the store alone to get the screws. Howell claims that Williams then called her and said that there were "too many cops" at the Walmart and that they should meet at a fire station in Twin Creek. Howell did meet Williams and Baxter to get the screws from them. According to Howell, Williams was driving the Z71 as she left the fire station, and Baxter was in the passenger seat.

¶10. At 2:38 p.m., Deputy Daffin, exiting a parking lot onto Scott Road, saw the Z71 on Old Highway 63 waiting to turn onto Scott Road. The Z71 turned onto Scott Road and was aligned parallel to Daffin's vehicle temporarily. Daffin saw that Williams was driving. He also saw that the passenger seat was leaned back and "could see what appeared to be an elbow or arm sticking up as if someone were trying to hide in the vehicle." At that point, Daffin believed Baxter was hiding in the Z71.

### *The Pursuit*

¶11. Daffin made a u-turn and approached the Z71 to attempt a traffic stop. Daffin testified that the Z71 accelerated as he turned around and that he did not catch up to it again until it had traveled down Scott Road to the intersection with Highway 26.

¶12. After stopping at the end of Scott Road, Williams turned onto Highway 26. Daffin followed Williams onto Highway 26 and turned on his blue lights and sirens. Daffin pursued

4

Williams for approximately 16.8 miles from Highway 26 to the scene of the impact. The entire chase took only thirteen to fourteen minutes. Throughout the chase, Williams often drove recklessly at speeds from 75 to 100 miles per hour.

### *The Checkpoint*

¶13.    After being notified of the pursuit, Sheriff Welford and Deputy Tony Keel left the Sheriff's department in Lucedale in Sheriff Welford's Dodge Charger (the "Charger"). They determined that the pursuit was headed west and set up a checkpoint at the intersection of Howard Road and Bexley Road South. Investigator Duane Bowlin and Agent Justin Strahan soon joined Sheriff Welford and Keel. Once the checkpoint was setup, Bexley Road South was not fully blocked in either direction. Two avenues of escape were left open in case Williams decided not to stop. Also, the blue lights in all three vehicles were activated.

¶14.    Deputy Bowlin testified that as soon as he arrived at the checkpoint, he exited his vehicle and was walking toward Sheriff Welford's Charger when he heard the "steady roar" of the Z71's approach. He turned back toward his own vehicle and turned again toward the Charger in time to see Sheriff Welford struck by the Z71.

¶15.    Bowlin further testified that he remembered seeing the passenger in the Z71 at the time of impact:

> I remember seeing what I thought at the time was a face, and I always said that it had hair characteristics similar to Chris Baxter . . . and I would have seen it right about the same time as the impact. As the truck passed by, it would have been a facial feature. And looking back now, I believe that person was looking at me as well.

Bowlin clarified that he did not merely assume that Baxter was the passenger: "I couldn't

5

identify who it was in the passenger seat. I just know when I saw the facial features, just a face with hair, similar to Chris Baxter's." He further testified that the passenger had short hair.

### *After the Pursuit*

¶16. Daffin came upon the scene soon after the Z71 left and exited his vehicle to assist Sheriff Welford. Sheriff Welford eventually was airlifted to a hospital. He passed away from his injuries on July 21, 2010.

### *Wednesday, July 22, 2010*

¶17. Baxter and Williams both were arrested on July 22, 2010. Law enforcement authorities interviewed Baxter on July 22. The interview was entered into evidence and played for the jury after Baxter asserted his Fifth Amendment right not to testify at Williams's trial.

### PROCEDURAL HISTORY

¶18. Williams was indicted by a George County grand jury on January 18, 2011, for capital murder under Mississippi Code Section 97-3-19(2)(a). After a jury trial, she was convicted of capital murder. *Williams v. State*, 174 So. 3d 275, 278 (Miss. Ct. App. 2014). Williams appealed her conviction and the Mississippi Court of Appeals reversed and remanded for a new trial. *Id*. at 286. Williams's case was retried before a jury on March 14 to March 18, 2016, in George County Circuit Court. Williams again was found guilty of capital murder. Williams filed a motion for a new trial, which was denied by the trial court.

¶19. On March 31, 2016, Williams filed her notice of appeal. She now raises six issues,

6

which we combine into three for clarity. First, Williams argues that the trial court erred in denying her motion to quash the indictment. Second, Williams argues that the trial court abused its discretion in instructing the jury regarding several different issues, including duress, eyewitness identification and aiding and abetting. Third, Williams argues that the trial court erred in allowing the State to present evidence of her prior crimes. Finding no error, we affirm Williams's conviction.

## ANALYSIS

### I.       The trial court did not err in denying Williams's motion to quash her indictment.

¶20.   Williams argues that the trial court erred in denying her motion to quash the indictment. According to Williams, the capital murder of a peace officer requires that the murder be committed with deliberate design; thus, she argues that the State erred in indicting her for depraved-heart capital murder.

¶21.   Williams was indicted for the capital murder of Sheriff Welford pursuant to Mississippi Code Section 97-3-19(2)(a). Williams's indictment charged:

> That BRANDY NICOLE WILLIAMS in George County, Mississippi, on or about July 21, 2010, did then and there willfully, unlawfully, feloniously and without the authority of law, kill and murder Garry Welford, a human being and a law enforcement officer, to-wit: sheriff of George County, Mississippi, while acting within his official capacity, and with knowledge that the said Garry Welford was a law enforcement officer, while the said Brandy Nicole Williams was engaged in an act alone or in conjunction with Christopher Baxter, which was imminently dangerous to others and evincing a depraved heart, regardless of human life, and against the peace and dignity of the State of Mississippi.

Section 97-3-19(2)(a) provides in part:

7

(2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:

> (a) Murder which is perpetrated by killing a peace officer or fireman while such officer or fireman is acting in his official capacity or by reason of an act performed in his official capacity, and with knowledge that the victim was a peace officer or fireman. . . .

Section 97-3-19(1)(a)–(b) sets forth the definition of murder as:

> (1) The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases:

> (a) When done with deliberate design to effect the death of the person killed, or of any human being . . .

> (b) When done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual . . . .

Miss. Code Ann. § 97-3-19(1) (Rev. 2014).

¶22. "[W]hether an indictment is defective is an issue of law and therefore deserves a relatively broad standard of review, or *de novo* review." *Colburn v. State*, 201 So. 3d 462, 469 (Miss. 2016) (quoting *State v. Hawkins*, 145 So. 3d 636, 638 (Miss. 2014)) (emphasis in original). "The major purpose of an indictment is to furnish the accused such a description of the charges against him as will enable him to adequately prepare his defense." *King v. State*, 580 So. 2d 1182, 1185 (Miss. 1991) (quoting *Williams v. State*, 445 So. 2d 798, 804 (Miss. 1984)). "The rule in this state is that an indictment which states the statutory language is generally sufficient to inform the accused of the charge against him." *Colburn*, 201 So. 3d at 469 (quoting *King*, 580 So. 2d at 1185).

¶23. Here, there is no error in Williams's indictment. We consistently have held that deliberate design is not an element of the capital murder of a peace officer. *See Fitzpatrick v. State*, 175 So. 3d 515, 518–21 (Miss. 2015) (surveying the recent history of the Supreme Court's and Court of Appeals' interpretations of Section 97-3-19(2)(a)). "[U]nder the applicable statute, malice aforethought is not an element of the capital murder of a peace officer." *Stevenson v. State*, 733 So. 2d 177, 186 (Miss. 1998), *overruled on other grounds by Bonds v. State*, 138 So. 3d 914 (Miss. 2014).

¶24. The *Fitzpatrick* Court dealt with many of the same arguments that Williams raises under this issue. In *Fitzpatrick*, the Court reviewed a jury instruction that permitted the jury to convict Fitzpatrick of capital murder under a theory of either depraved-heart or deliberate-design murder. *Fitzpatrick*, 175 So. 3d at 518. Citing *Mease v. State*, 539 So. 2d 1324, 1325 n.1 (Miss. 1989), the defendant—as Williams does now—argued that the term " capital murder" required a finding of deliberate design. *Fitzpatrick*, 175 So. 3d at 518–19. The Court disagreed. *Id*. at 519–20. It noted that "[i]n the years following *Mease*, this Court has held that subsection [97-3-19](1)(b)[, depraved-heart murder,] subsumes subsection (1)(a)[, deliberate-design murder]." *Id*. at 519. The Court also recognized that "where depraved heart is sufficient for a conviction as a matter of law, a showing of deliberate design is not required." *Id*. at 520.

¶25. Today we find no reason to depart from the rationale expressed in *Fitzpatrick*. While Williams raises her argument in the context of an indictment as opposed to challenging the jury instructions, this procedural difference does not affect our analysis. In fact, since the

9

indictment charged Williams with only depraved-heart capital murder, this case is a stronger set of facts than the facts before the *Fitzpatrick* Court, where the jury could convict the defendant under two separate theories of murder.

¶26. Williams was indicted for capital murder under Section 97-3-19(2)(a) pursuant to a depraved-heart theory. Her indictment satisfied the statutory requirements.[2] Thus, the trial court did not err in denying Williams's motion to quash her indictment.

## II. The trial court did not abuse its discretion in instructing the jury.

¶27. "This Court reviews the grant or refusal of a jury instruction 'under an abuse-of-discretion standard.'" *Shelton v. State*, 214 So. 3d 250, 258 (Miss. 2017) (quoting *McInnis v. State*, 61 So. 3d 872, 875 (Miss. 2011)). When reviewing errors pertaining to jury instructions, "[t]his Court does not single out any instruction or take instructions out of context; rather, the instructions are to be read together as a whole." *Dickerson v. State*, 175 So. 3d 8, 26 (Miss. 2015) (internal quotations omitted). Further, the law provides a criminal defendant the right "'to have jury instructions which present his theory of the case.'" *Roberson v. State*, 199 So. 3d 660, 664 (Miss. 2016) (quoting *Dickerson*, 175 So. 3d at 26). This right "'is limited, however, in that the court is allowed to refuse an instruction which

---

[2]Williams argues that the Legislature amended the statute after this Court rendered its decision in *Fitzpatrick*, adopting degrees of murder. Williams argues that the amendment, in essence, overruled the line of cases on which *Fitzpatrick* relied. This is simply not the case. *Fitzpatrick* handed down on July 23, 2015. The Legislature adopted degrees of murder in 2013 pursuant to Senate Bill 2377. 2013 Miss. Laws 555. In fact, *Fitzpatrick*, in a footnote, acknowledges the 2013 amendment that Williams now cites for support. *Fitzpatrick*, 175 So. 3d at 519 n.5 ("This section was amended in 2013 and now provides . . . ."). Thus, the *Fitzpatrick* Court acknowledged the Legislature's additions to the statute.

incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.'" *Id*.

### A. Duress Instruction

¶28. Williams argues that she was denied her right to present her theory of the case when the trial court refused to instruct the jury on th defense of duress.[3] Williams's theory of the case was that she participated in the flight from the police only under duress.

¶29. In Mississippi, it is true that "[w]here a person reasonably believes that he is in danger of physical harm he may be excused for some conduct which ordinarily would be criminal." *Davis v. State*, 18 So. 3d 842, 849 (Miss. 2009) (citation omitted). In Mississippi, there is a four-part test for duress:

> (1) the defendant was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension

---

[3] The jury instruction at issue here is D-12. It read:

> The Court instructs the jury that evidence has been presented that the defendant acted under duress in committing the crime with which she is charged.

> Duress is the exercise of unlawful force upon a person whereby that person is compelled to do some act that he otherwise would not have done. In order for duress to be a defense to a criminal charge, the impelling danger must be present, imminent, and impending, and of such a nature as to introduce in that person a well-grounded apprehension of death or serious bodily harm if the act is not done. A person having a reasonable opportunity to avoid committing the crime without undue exposure to death or serious bodily harm cannot invoke duress as a defense.

> If the prosecution has failed to prove from the evidence in this case beyond a reasonable doubt that Brandy Williams acted voluntarily in committing the crime and not under duress, then you shall find her not guilty.

11

of death or serious bodily injury; (2) that he had not recklessly or negligently placed himself in the situation; (3) that he had no reasonable legal alternative to violating the law; (4) that a direct causal relationship may be reasonably anticipated between the criminal action and the avoidance of harm.

***Banyard v. State***, 47 So. 3d 676, 681–82 (Miss. 2010).

¶30.    After a review of the record, it is apparent that the facts here do not support these elements.[4]  Williams had the opportunity to stop the Z71 before fleeing from Daffin and could have yielded anywhere along the 16.8 mile route.  While Baxter yelled at Williams to flee, there was no evidence of an unlawful and impending threat.  Also, Williams knew before she agreed to drive Baxter that he was a felon and that the police were searching for him.  Despite this, she drove him into town and went into the Walmart for him so that he would not be seen by the police.  Instead of shopping for him, she could have contacted law enforcement in Walmart and reported him.  She also could have yielded to either  Daffin or the four armed officers at the checkpoint instead of striking Sheriff Welford.  In light of these facts, the trial court did not abuse its discretion in refusing to instruct the jury on duress.

### B.    Eyewitness-Identification Instruction

¶31.    Williams argues that the trial court abused its discretion by denying Jury Instruction D-7 on eyewitness identification.  In part, instruction D-7 read,

> If, after considering all of the evidence concerning the event and the witness's

---

[4] We do not address the question of whether or not a duress instruction applies to the capital murder of a law enforcement officer, as the facts here do not merit the analysis. *Compare* ***Banyard***, 47 So. 3d at 681–82 (reversing felony-capital-murder conviction where duress instruction was refused), *with* ***Sanders v. State***, 942 So. 2d 156, 161 (Miss. 2006) ("[L]ongstanding Mississippi law holds that duress is not a legal defense to murder."), and ***Wilson v. State***, 390 So. 2d 575, 576 n.1 (Miss. 1980) ("Homicide is an exception [to duress]").

12

identification of Miss Williams as the person who was driving, you are not convinced beyond a reasonable doubt that she is the person who was driving at the time the Sheriff was hit, then you must find her not guilty.

We find that this instruction misstated the law.

¶32. As the Court of Appeals recognized in Williams's initial appeal, "This is an incorrect statement of the law. Williams may be guilty if she aided and abetted Baxter even if she was not driving." *Williams*, 174 So. 3d at 284. As requested, the instruction would have required the jury to find Williams not guilty if she was not driving at the moment of impact without considering whether or not she was liable as an aider and abettor instead of as the principal. Williams was on notice of this error of law in the instruction from her initial appeal but chose to request the same instruction again despite the error. Therefore, we find that the trial court did not abuse its discretion in refusing the instruction.

### C.    Aiding and Abetting Instructions

¶33. On appeal, Williams argues for the first time that the trial court abused its discretion by instructing the jury on two separate legal theories of murder. Williams claims that it was error for the jurors to be instructed that they could convict Williams of murder if they found either (1) that she drove the Z71 when it struck Sheriff Welford or (2) that she aided and abetted Baxter while he drove. She argues that the jury instructions relieved the State of its burden to prove guilt beyond a reasonable doubt. Williams did not object at trial to any of the State's instructions relating to this issue. Moreover, as discussed below, Williams actually introduced a portion of the instructions that she now appeals.

¶34. "Failure to object to an instruction at trial bars that issue on appeal." *Missala Marine*

13

*Servs., Inc. v. Odom*, 861 So. 2d 290, 296 (Miss. 2003) (citing *Jones v. State*, 776 So. 2d 643, 653 (Miss. 2000)).  Further, when a party acquiesces to the giving of a jury instruction, that party is procedurally barred from later raising an error with the instruction on appeal. *See Jones*, 776 So. 2d at 653; *see also* **Butler v. State**, 544 So. 2d 816, 818 (Miss. 1989).

¶35.    Here, the jury was instructed on some portion of the aiding and abetting theory under three separate instructions: S-3, S-4A, and D-3A.  Jury Instruction S-3 defined the general principles of aiding and abetting liability.  In part, the instruction read:

> The Court instructs the jury that . . . [t]he law recognizes that, ordinarily, anything a person can do for herself may also be accomplished by that person through the direction of another person as her agent, or by acting in concert with, or under the direction of, another person or persons in a joint effort or enterprise.
>
> . . .
>
> In other words, you may not find the defendant guilty unless you find beyond a reasonable doubt that every element of the offense as defined in these instructions was committed by some person or persons, and that the defendant voluntarily participated in its commission with the intent to violate the law.

Jury Instruction S-4A read, "The Court instructs the jury that one who willfully, unlawfully, and feloniously aids, abets, assists, participates, or otherwise encourages the commission of a crime is just as guilty under the law as if she had committed the whole crime with her own hands."  Jury Instruction D-3A read:

> The Court instructs the jury that if you find that on July 21, 2010, Christopher Baxter killed Garry Welford, a law enforcement officer acting in his official capacity with knowledge that Garry Welford was a law enforcement officer acting in his official capacity, by hitting him with an automobile and that Brandy Williams was present at the commission of that act by Christopher Baxter and knowingly and willfully aided, abetted, assisted or encouraged Christopher Baxter in the commission of that act, you may

14

consider whether Brandy Williams is an aider and abettor to capital murder.

> In order to find Brandy Williams guilty as an aider and abettor you must be convinced, beyond a reasonable doubt that Brandy Williams possessed a community of criminal intent with Christopher Baxter, either before or at the time the act was committed.

¶36. At trial, Williams not only acquiesced to the State's instructions which she now challenges, she also requested her own aiding and abetting instruction. Williams did not object to either Jury Instruction S-3 or S-4A and requested Jury Instruction D-3A, which ultimately was given to the jury. In light of this, we find that Williams has waived her right to raise this error on appeal.

¶37. Despite this waiver, Williams's arguments on this issue are without merit. The jury instructions, when read as a whole, accurately state the law to the jury. It is settled Mississippi law that a defendant pursuant to an aider and abettor theory is as liable for the crimes of the principal as if the defendant had actually committed the crimes. *See **Hoops v. State***, 681 So. 2d 521, 533 (Miss. 1996) ("Any person who is present at the commission of a criminal offense and aids, counsels, or encourages another in the commission of that offense is an 'aider and abettor' and is equally guilty with the principal offender."). Thus, even if Williams's arguments were not procedurally barred, the jury was properly instructed on the law.

> **III.** **The trial court did not abuse its discretion in admitting the evidence of Williams's prior bad acts**.

¶38. This Court reviews the admission or exclusion of evidence under an abuse-of-discretion standard. ***Hargett v. State*** 62 So. 3d 950, 952 (Miss. 2011). "A trial judge enjoys

a great deal of discretion as to the relevancy and admissibility of evidence." *Id*. (quoting

*Price v. State*, 898 So. 2d 641, 653 (Miss. 2005)). "'Where error involves the admission or

exclusion of evidence, this Court will not reverse unless the error adversely affects a

substantial right of a party.'" *Id*. (quoting *Ladnier v. State*, 878 So. 2d 926, 933 (Miss.

2004)).

¶39.    It is a general principle of law that "[e]vidence of a crime . . . is not admissible to

prove a person's character in order to show that on a particular occasion the person acted in

accordance with the character." M.R.E. 404(b)(1).  Evidence of a crime, though, "may be

admissible for another purpose, such as proving motive . . . ." M.R.E. 404 (b)(2).  Further,

"[e]vidence of other crimes or bad acts is also admissible in order to tell the complete story

so as not to confuse the jury." *Simmons v. State*, 813 So. 2d 710, 716 (Miss. 2002) (citing

*Brown v. State*, 483 So. 2d 328, 330 (Miss. 1986)).  This evidence of crime may still be

excluded, though, "if its probative value is substantially outweighed by a danger of one or

more of the following: unfair prejudice, confusing the issues, misleading the jury, undue

delay, wasting time, or needlessly presenting cumulative evidence." M.R.E. 403.

¶40.    Here, the trial court did not abuse its discretion in admitting Williams's two

indictments for grand larceny coupled with Williams's pretrial diversion agreement.  The

evidence was admitted for the purpose of proving motive under Rule 404(b)(2). As the State

argued at the pretrial hearing in response to Williams's motion in limine, the evidence of the

crime was admissible to show that Williams had a motive to flee from the police instead of

yielding to Deputy Daffin.  Williams had just entered the diversion agreement that required

16

her to "avoid persons . . . of disreputable or harmful character." Christopher Baxter was a convicted felon, and Williams knew this. Williams also knew that the police were searching for Baxter, as they had asked her about his whereabouts just two days before. The evidence of Williams's prior crimes and pretrial diversion agreement tended to show that Williams knew that had she yielded to Daffin's blue lights and stopped, she could have been found in violation of the agreement. Therefore, the evidence demonstrated Williams's motive to flee from law enforcement. In other words, the evidence was admissible to tell the whole story to the jury.

¶41. While Williams argues that she would not have been motivated to avoid Deputy Daffin because it was known throughout the community that she was dating Baxter, the evidence at trial contradicts this argument. First and foremost, Williams had entered into the agreement only on July 15, 2010—six days before the chase. In addition, Williams testified that she had mentioned the pretrial diversion agreement to Baxter as one of the reasons that she wanted to break up with Baxter. Before the grand jury, Williams said, "I . . . told [Baxter] right after we left his dad's that . . . I didn't want to be with him anymore. We were breaking up . . . because I had just got put on Pretrial Diversion."

¶42. It is clear from the record of the pretrial hearing that the trial court considered whether the value of the evidence was substantially outweighed by a danger of unfair prejudice under Mississippi Rule of Evidence 403. Thus, because the evidence of Williams's prior crimes and the pretrial diversion agreement demonstrated Williams's motive to flee from law enforcement, the trial court did not abuse its discretion in admitting the evidence.

## CONCLUSION

¶43. Finding no error, we affirm the conviction of capital murder and the sentence of life without the possibility of parole in the custody of the Mississippi Department of Corrections.

¶44. **AFFIRMED**.

**WALLER, C.J., RANDOLPH AND KITCHENS, P.JJ., KING, COLEMAN, MAXWELL AND BEAM, JJ., CONCUR. ISHEE, J., NOT PARTICIPATING.**