# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-KA-01368-SCT

*GREGORY WAYNE COLBURN a/k/a GREGORY WAYNE CULBURN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/19/2014 |
| TRIAL JUDGE: | HON. WILLIAM E. CHAPMAN, III |
| TRIAL COURT ATTORNEYS: | LARRY BAKER |
| | JAMES GIDDY |
| | KELLY G. WILLIAMS |
| | CATHY CRONIN COUGHLIN |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | KELLY G. WILLIAMS |
| | CATHY CRONIN COUGHLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALICIA AINSWORTH |
| DISTRICT ATTORNEY: | MICHAEL GUEST |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/11/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1. A jury convicted Gregory Colburn of two counts of exploitation of a vulnerable person. The trial court sentenced him to twenty years: ten years on each count, running consecutively. Colburn now appeals and argues that the exploitation statute is unconstitutionally vague, that his indictment should have been quashed, that the State failed

to present sufficient evidence to support his convictions, and that his defense was hampered by the judge's evidentiary rulings. We affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. Colburn met Ruby Frances Hill in 1990 when he began servicing her burial-insurance policy; Colburn would visit the policyholders' houses each month to collect the premiums. Over the years, Hill and Colburn became close friends—Colburn defined it as a grandmother-grandson relationship—and eventually he became her primary caregiver.[1] At first, Hill would ask Colburn to run simple errands—like paying a bill or picking something up from Walmart—but after Hill's mother passed away, Hill began relying on Colburn for more help. And when Hill had a car accident, she started relying on Colburn as her driver. Colburn testified that he telephoned Hill at 9:30 every night, even if he had spent the day running errands with her, and even if he was out of town on tour with his gospel trio, the Men of Music.

¶3. In October 2011, Hill executed a general power of attorney and an advanced healthcare directive, naming Colburn as her agent in both documents. Both documents were notarized, and the notary testified that Hill knew what she was doing when she executed them.

¶4. In January 2012, Hill moved into Heritage House, an assisted-living facility in Rankin County. This move happened sometime after she was diagnosed with dementia, but the record is unclear if that diagnosis prompted the move. Corrine Watts, a Heritage House

---

[1]The State does not dispute any of the facts of Hill's and Colburn's relationship.

employee, testified that the facility had a dementia ward, but Hill was not a resident of that ward; she had a first-floor studio apartment and could come and go as she pleased. She said Colburn and Hill had a very loving and caring relationship. She also testified that, to her knowledge, Colburn was the only person who visited Hill there.

¶5.     Colburn helped Hill with her banking on several occasions. Hill owned a house in Brookhaven, so she often would conduct her banking at the Trustmark branch there. Brenda Henderson, who worked at the Brookhaven Trustmark and assisted Hill, testified that she was familiar with Colburn because he brought Hill to the bank. According to Henderson, Hill said that Colburn was a friend of the family and that she could trust him. Henderson testified that she had no concerns about the relationship, and that Colburn seemed to care for Hill. Henderson said Hill always seemed happy around Colburn.

¶6.     On one occasion, when Colburn was transacting some of Hill's business at another Trustmark branch—he was making a deposit for Hill and requesting cash back—that bank's manager called Henderson, questioning the transaction. Henderson called Hill to make sure that was what she wanted and informed the other branch manager of this. Henderson testified that Hill always seemed to know what she was doing. Henderson was aware that Hill had executed a power of attorney naming Colburn as her agent but, to her knowledge, Colburn never transacted any business at the Brookhaven Trustmark under that document.

¶7.     Colburn was with Hill when she opened a joint checking account at Community Bank in April 2012. Tracy Primer was the bank employee who helped Hill set up the account, and

3

she testified that Hill appeared to know what she was doing, and that she did not appear to have been coerced into opening the account.

¶8. Hill wrote several large checks to Colburn in 2012, ranging from around $3,000 to more than $52,000. She also moved $125,000 from a Trustmark account into the joint checking account she shared with Colburn and ultimately closed that Trustmark account. Trustmark officials came across these transactions when they were investigating Hill's account for an unrelated issue having to do with a Social Security check. Trustmark notified the Attorney General's Office, which in turn initiated an investigation. After the investigation, a Rankin County grand jury indicted Colburn on three counts of exploitation of a vulnerable person under Mississippi Code Section 43-47-19.

¶9. After a trial in Rankin County Circuit Court in July 2014,[2] the jury convicted Colburn of counts one and two, but acquitted him of count three. Colburn appeals, arguing five issues:

> 1)The statute under which [he] was indicted and convicted is unconstitutionally vague and overly broad;
>
> 2) The trial court erred in denying [his] Motion to Quash Indictment as the indictment failed to state an indictable offense;
>
> 3) There was insufficient evidence to support [his] conviction; therefore, the trial court erred by denying [his] Motions for Directed Verdict and Judgment Notwithstanding the Verdict;
>
> 4) The trial court erred in denying the testimony of [his] expert witness and denying the admission of the last will and testament and handwritten letter of Ruby Hill; and

---

[2]An earlier trial had ended in mistrial because two jurors had "reported a conflict in the case."

4

5) The trial court erred by admitting into evidence a photograph of Ruby Hill.

**ANALYSIS**

**1. The Mississippi Vulnerable Persons Act is not unconstitutionally vague**.

¶10.    Colburn first attacks the constitutionality of the Mississippi Vulnerable Persons Act[3] (the "Act")—specifically, Sections 43-47-5 and 43-47-19—arguing that the terms "vulnerable person," "exploitation," and "improper use" are unconstitutionally vague and overbroad.[4] Colburn argues that "[u]nder the broad, general provisions of [Section] 43-47-5, prosecutors could seemingly bring criminal charges against any caregiver within the borders of Mississippi."

¶11.    This Court has held that

> [a] party challenging the constitutionality of a statute must prove his case by showing the unconstitutionality of a statute beyond a reasonable doubt. This Court will strike down a statute on constitutional grounds only where it appears beyond all reasonable doubt that such statute violates the constitution. We adhere here to the rule that one who assails a legislative enactment must overcome the strong presumption of validity and such assailant must prove his conclusion affirmatively, and clearly establish it beyond a reasonable doubt. All doubts must be resolved in favor of the validity of a statute. If possible, courts should construe statutes so as to render them constitutional rather than unconstitutional if the statute under attack does not clearly and apparently conflict with organic law after first resolving all doubts in favor of validity.

---

[3] See Miss. Code Ann. §§ 43-47-1 to 43-47-39 (Rev. 2015).

[4] Colburn argues that the statute is overly broad because it criminalized activity here that was carried out under a lawful power of attorney, properly executed, and not shown to be the result of undue influence or duress.  Because this argument focuses on the evidence in this case rather than the words of the statute, we address this issue with Colburn's other sufficiency-of-the evidence arguments.

***Richmond v. City of Corinth***, 816 So. 2d 373, 375 (Miss. 2002) (internal citations and punctuation omitted). "The U.S. Supreme Court has ruled that 'the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" ***Fulgham v. State***, 47 So. 3d 698, 701 (Miss. 2010).

¶12. Colburn relies heavily on dicta from a case in which this Court reversed a conviction for exploitation of a vulnerable adult. ***Decker v. State***, 66 So. 3d 654 (Miss. 2011). Although this Court decided that case on other grounds, it alluded to possible constitutional problems with the Act's breadth:

> The statute's term "exploitation" is defined as "the illegal or **improper use** of a vulnerable person or his resources for another's profit or advantage, **with or without the consent** of the vulnerable adult . . . ." The term "improper purpose"—which is not defined within the statutes—forms the base for Decker's argument that the statute is unconstitutionally vague.

> This case was prosecuted by—and the appeal has been presented by—the Attorney General's office. At oral argument, the assistant attorney general argued that *any* use of a vulnerable person's money for personal benefit would be an improper use, even with the vulnerable person's consent. So we must accept that interpretation as to how citizens are to be prosecuted under the statute.

> Under Section 43-47-19—as applied by the Attorney General, and as its terms are defined in Section 43-47-5—a vulnerable adult cannot give a spouse permission to withdraw money from a checking account to buy herself a birthday present; or give one of her children or grandchildren permission to withdraw money to pay college tuition. According to the argument presented by the Attorney General's office, both these actions would constitute crimes.

> We are troubled by the statute's broad reach. But because we have decided this case based on [another issue], we decline to address today the constitutionality of the statute.

*Id.* at 658 (emphasis original). But in 2012, the year after this Court decided ***Decker***, the Legislature amended the Act to include a definition of "improper use," as well as a definition of "undue means." Miss. Ann. § 43-47-5 (k), (p) (Rev. 2015).

¶13. The Act provides that "[a]ny person who willfully exploits a vulnerable person . . . where the value of the exploitation is Two Hundred Fifty Dollars ($250) or more . . . shall be guilty of a felony . . . ." Miss. Code Ann. § 43-47-19(2)(b) (Rev. 2015). The Act defines a "vulnerable person" as

> a person, whether a minor or adult, whose ability to perform the normal activities of daily living or to provide for his or her own care or protection from abuse, neglect, exploitation or improper sexual contact is impaired due to a mental, emotional, physical or developmental disability or dysfunction, or brain damage or the infirmities of aging. The term "vulnerable person" also includes all residents or patients, regardless of age, in a care facility . . . .

Miss. Code Ann. § 43-47-5(q) (Rev. 2015). "Exploitation" means

> the illegal or improper use of a vulnerable person or his resources for another's profit, advantage or unjust enrichment, with or without the consent of the vulnerable person, and may include actions taken pursuant to a power of attorney. "Exploitation" includes, but is not limited to, a single incident.

Miss. Code Ann. § 43-47-5(I) (Rev. 2015).

¶14. "Illegal use," in turn, means "any action defined under Mississippi law as a criminal act." Miss. Code Ann. § 43-47-5(j) (Rev. 2015). And "improper use" means

> any use without the consent of the vulnerable person, any use with the consent of the vulnerable person if the consent is obtained by undue means, or any use that deprives the vulnerable person of his ability to obtain essential services or

7

a lifestyle to which the vulnerable person has become accustomed and could have otherwise afforded.

Miss. Code Ann. § 43-47-5(k) (Rev. 2015). Finally, the Act defines "undue means" as

the use of deceit, power, or persuasion over a vulnerable person resulting in the vulnerable person being influenced to act otherwise than by his own free will or without adequate attention to the consequences.

Miss. Code Ann. § 43-47-5(p) (Rev. 2015).

¶15. Colburn argues first that the term "vulnerable person" is unconstitutionally vague because it includes people whose mental faculties are sound but who merely suffer physically. Colburn posits that "the statutory language does not eliminate any one [sic] being treated for conditions, ailments, impairments, or any other circumstance that may have absolutely nothing to do with mental awareness, capacity or competency." But Colburn does not elaborate on his argument or provide any authority for his suggestion that the Constitution somehow is violated by a law that protects from exploitation and abuse those citizens who suffer from ailments other than mental incapacity or deficiency.

¶16. The State recognizes that the statutory definition of "vulnerable person" is broad but argues that "the statute's broad definition of 'vulnerable person' ensures that people whose abilities are equally impaired by causes other than just mental impairments are included in the protected category of people. A person with a physical or emotional disability may be as vulnerable to abuse, neglect and [exploitation] as a person with a mental impairment." But the State posits that innocent conduct is protected from the reach of the statute by the

8

exploitation[5] element and its required subelements. In other words, the broad, threshold issue of who is a vulnerable person does not render the statute unconstitutional. We agree. While the Legislature has defined the term "vulnerable person" broadly we find that the remaining elements and the definitions of those elements now contained in the Act "'define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Fulgham*, 47 So. 3d at 701.

¶17. Colburn argues also that the term "improper use" is unconstitutionally vague, claiming that "[t]here is absolutely no objective standard in determining the answer[] to what is 'improper use' and subjecting innocent citizens to selective prosecution." Colburn argues that the statutory definition leaves the term open to subjective interpretation and therefore violates United States Supreme Court precedent that requires penal statutes to be "explicit and well-defined, and not subject to arbitrary, selective, or discriminatory enforcement."

¶18. The State argues that "'improper use' is explicitly defined in the statute in a manner that is not subject to more than one meaning." Specifically, the State argues that "[t]here are four instances when the use of a vulnerable person's resources is considered improper pursuant to the statute and those four ways are unambiguous."[6] That unambiguous

---

[5]Like his "overbreadth" argument, Colburn's "exploitation" argument is really a sufficiency-of-the evidence argument, and we therefore address it later in this opinion.

[6]Those four ways are:
(1) any use without the consent of the vulnerable person;
(2) any use with the consent of the vulnerable person if the consent is obtained by undue means;
(3) any use that deprives the vulnerable person of his ability to obtain essential

9

definition, the State argues, "cures the issue of the statute's overbreadth so that constitutionally protected conduct is not punished."

¶19.    Again, we agree with the State. We find that the recently enacted statutory definition of "improper use" has, at least on its face, cured any vagueness problems that the exploitation statutes might have had and that troubled this Court in ***Decker***. Put simply, following the Legislature's addition of a definition of "improper use," Colburn's argument that there is "absolutely no objective standard in determining the answer[] to what is 'improper use'" is incorrect. Indeed, the troubling hypothetical scenarios described by the ***Decker*** Court are no longer possible: under the statutes as currently written, a vulnerable person *may* consent to his or her spouse using their debit card to withdraw money to buy themselves a gift, and a vulnerable person *may* consent to his or her child or grandchild withdrawing money to use for tuition, as long as that consent was not obtained by undue means. *See **Decker***, 66 So. 3d at 658.

### 2. The trial judge did not err when he denied Colburn's motion to quash his indictment.

¶20.    Colburn argues next that the trial court should have granted his motion to quash the indictment. This Court has held that "whether an indictment is defective is an issue of law and therefore deserves a relatively broad standard of review, or *de novo* review . . . ." ***State v. Hawkins***, 145 So. 3d 636, 638 (Miss. 2014) (quoting ***Tapper v. State***, 47 So. 3d 95, 100

---

services or (4) to obtain a lifestyle to which the vulnerable person has become accustomed and could have otherwise afforded.

Miss. Code Ann. § 43-47-5(k) (Rev. 2015).

10

(Miss. 2010)) (internal quotation marks omitted). Uniform Rule of Circuit and County Court

Practice 7.06 provides in part that an indictment

> shall be a plain, concise and definite written statement of the essential facts constituting the offense charged and shall fully notify the defendant of the nature and cause of the accusation. Formal and technical words are not necessary in an indictment, if the offense can be substantially described without them.

URCCC 7.06. "The rule in this state is that an indictment which states the statutory language

is generally sufficient to inform the accused of the charge against him." *King v. State*, 580

So. 2d 1182, 1185 (Miss. 1991) (quoting *Cantrell v. State*, 507 So. 2d 325, 329 (Miss.

1987)). "This Court has made it 'clear that the ultimate test, when considering the validity

of an indictment on appeal, is whether the defendant was prejudiced in the preparation of his

defense.'" *Byrom v. State*, 863 So. 2d 836, 867 (Miss. 2003) (quoting *Medina v. State*, 688

So. 2d 727, 730 (Miss. 1996)).

¶21.    All three counts for which Colburn was indicted tracked the exploitation statute, and

the counts varied only in two places: in the dates alleged, and in the last sentence, where

specific facts are alleged. Count I charged

> that Gregory Wayne Colburn between February 1, 2012 and August 31, 2012 in the County and State aforesaid and within the jurisdiction of this Court, did wilfully, unlawfully, feloniously, knowingly, and intentionally exploit Ruby Hill, a vulnerable adult as defined by Section 43-47-5(n) of the Mississippi Code of 1972, as amended, and with knowledge that Ruby Hill's ability to perform normal activities of daily living or to provide for her own care or protection from abuse, neglect, or exploitation was impaired due to mental, emotional, physical or developmental disability or dysfunction, or brain damage or the infirmities of aging, did exploit Ruby Hill, by the illegal or improper use of Ruby Hill's resources, in an amount over two hundred fifty dollars ($250.00), for his own profit or advantage, with or without the consent of Ruby Hill, including acts committed pursuant to power of attorney, by

11

depositing checks made payable to Ruby Hill into his personal Community Bank account [account number] in violation of M.C.A. Section 43-47-19 of 1972, as amended[.]

Count II was identical to Count I, except that it charged Colburn with exploiting Hill "by creating a Community Bank account [account number] in the name of 'Ruby Francis Hill or Gregory Wayne Colburn,' and then transferring funds belonging to Ruby Hill into the account, and using these funds for his own profit or advantage in violation of M.C.A. Section 43-47-19 of 1972, as amended[,]" between May 1, 2012, and August 21, 2012. Count III again was virtually identical to the first two counts, except that it charged Colburn with exploiting Hill "by depositing a check made payable to Ruby Hill and a check from Ruby Hill's Trustmark bank account [account number] into a 'Men of Music' bank account [account number] in violation of M.C.A. Section 43-47-19 of 1972[,]" between February 1, 2012, and March 31, 2012.

¶22. Colburn claims that, since the financial transactions are not disputed and because he had Hill's consent, none of the facts charged in the indictment amount to illegal acts, and so the indictment denied him "a reasonable opportunity to prepare and present a defense . . . ." According to Colburn, because every count included the language "with or without the consent of Ruby Hill," then "the grand jury could have found that Ruby Hill did in fact give her consent for every act alleged by the indictment, which if given without undue influence, is perfectly legal." So according to Colburn, the indictment put him in the impossible position of being forced to prepare a "defense for legal acts[.]"

12

¶23.    The State, on the other hand, points out that the indictment tracks the statute, including the "with or without the consent" language.[7]  The State also argues that the specific facts alleged in the indictment put Colburn on notice of the crimes with which he was being charged.  The State argues finally that the "did exploit" and "illegal or improper use" language in the indictment prevented the grand jury from charging Colburn with any innocent acts.

¶24.    Our analysis of this issue is similar to our analysis of Colburn's constitutionality claim.  While the indictment did contain the language "with or without the consent of Ruby Hill—again, language quoted directly from the statute—it also said that Colburn "exploited" Hill "by the illegal or improper use of" her resources.  As such, any behavior of Colburn's that the grand jurors deemed "innocent" would have, by definition, been excluded.  In short, we find that the indictment satisfied the requirements of Rule 7.06 in that it was "a plain, concise and definite written statement of the essential facts constituting the offense charged" that "fully notif[ied] the defendant of the nature and cause of the accusation." Colburn knew the statute he was charged with violating.  He knew the date ranges, the transactions, the banks, the account numbers, and the alleged victim of the crimes charged.

---

[7]"It shall be unlawful for any person to abuse, neglect or exploit any vulnerable person."  Miss. Code Ann. § 43-47-19(1) (Rev. 2015).  And again, "exploitation" is defined as "the illegal or improper use of a vulnerable person or his resources for another's profit, advantage or unjust enrichment, *with or without the consent of the vulnerable person*, and may include actions taken pursuant to a power of attorney.  '"Exploitation"' includes, but is not limited to, a single incident."  Miss. Code Ann. § 43-47-5(i) (Rev. 2015) (emphasis added).

¶25. It appears that the crux of Colburn's issue with the indictment is that it failed to state which type of "improper use" was being charged. And he correctly asserts that consent is a total defense to *one* of the four types. But there were three other ways he could have "improperly" used Ruby Hill's resources. *See supra,* n. 6. And this Court has not required that level of specificity in indictments. *See, e.g.*, **State v. Hawkins**, 145 So. 3d 636, 645 (Miss. 2014). The trial judge did not err when he denied Colburn's motion to quash.

### 3. Colburn's convictions were supported by sufficient evidence.

¶26. Colburn argues that, even in the light most favorable to the State, the evidence was insufficient to sustain his convictions, so the trial court should have granted his motion for directed verdict or his motion for judgment notwithstanding the verdict (JNOV).

¶27. When considering a sufficiency-of-the-evidence argument, this Court has said that

> the critical inquiry is whether the evidence shows beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction. However, this inquiry does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. *Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.*

**Fagan v. State**, 171 So. 3d 496, 503 (Miss. 2015) (quoting **Bush v. State**, 895 So. 2d 836, 843 (Miss. 2005)) (internal alterations and quotation marks omitted) (emphasis added). This Court may reverse only "'where, with respect to one or more of the elements of the offense charged, *the evidence so considered is such that reasonable and fair-minded jurors could*

*only find the accused not guilty.*'" ***Franklin v. State***, 676 So. 2d 287, 288 (Miss. 1996) (quoting ***Wetz v. State***, 503 So. 2d 803, 808 (Miss. 1987)) (emphasis added).

¶28.    Colburn was convicted on two counts of exploitation of a vulnerable person. There is no dispute that, at all relevant times, Ruby Hill was a "resident or patient . . . in a care facility," and therefore a "vulnerable person" under the Act. To prove that Colburn exploited Hill, the State was required to prove that he "illegal[ly] or improper[ly] use[d] a vulnerable person or [her] resources for another's profit, advantage or unjust enrichment, with or without the consent of the vulnerable person . . . . " Miss. Code Ann. § 43-47-5(i) (Rev. 2015). Exploitation "may include actions taken pursuant to a power of attorney." *Id.*

¶29.    While the "illegal or improper" language was in the indictment and the jury instructions, nothing else indicates that the State alleged that Colburn's use of Hill's resources was illegal. Rather, the State argues that the evidence "demonstrates that Colburn exploited Ms. Hill through the *improper* use of her resources for his own profit or advantage." As discussed above, under the statute are four ways that the State could prove "improper use": (1) Any use without the consent of the vulnerable person; (2) any use with the consent of the vulnerable person if the consent is obtained by undue means; (3) any use that deprives the vulnerable person of his ability to obtain essential services; or (4) any use that deprives the vulnerable person of his ability to obtain a lifestyle to which the vulnerable person has become accustomed and could have otherwise afforded. Miss. Code Ann. § 43-47-5(k) (Rev. 2015).

¶30. The State did not present any evidence of Hill's net worth or available resources. And while the State introduced evidence of the money that was involved in the transactions at issue, it did not present evidence that Hill had been deprived of her "ability to obtain" either "essential services" or "a lifestyle to which [she] ha[d] become accustomed and could have otherwise afforded." Miss. Code Ann. § 43-17-5(k). As such, the issue here is if the State's evidence was sufficient for any rational juror to conclude that Colburn's use of Hill's resources, as described in Counts I and II, was done either without her consent, or with her consent that was obtained by undue means. Again, the Act defines undue means as "the use of deceit, power, or persuasion over a vulnerable person resulting in the vulnerable person being influenced to act otherwise than by his own free will or without adequate attention to the consequences." Miss. Code Ann. § 43-47-5(p) (Rev. 2015).

¶31. The State presented four witnesses in its case-in-chief: Hill's treating physician Dr. Todd Perkins, Trustmark Bank employee Doug Winstead, Community Bank employee Christy Jones, and Investigator Russell Frazier. Dr. Perkins testified that Hill became his patient in early 2012 when she was referred to him as her primary physician. Dr. Perkins's treatment of Hill varied, but sometimes it was as often as every two weeks. Dr. Perkins's testified that Hill was "always pleasant and – but not very conversant . . . . " When asked about her mental ability, Dr. Perkins said that Hill "[s]eemed to be impaired. She had a diagnosis of dementia." Dr. Perkins described dementia as "a group of symptoms [a]ffecting [sic] cognitive function, thinking, memory loss, and other social functioning to the point

16

where it [a]ffects your daily activities." Dr. Perkins testified that Hill displayed characteristics of dementia; specifically, impaired cognition and slow memory.

¶32. When asked if Hill was able to care for herself, Dr. Perkins said "[i]n my opinion, no." Dr. Perkins also opined that Hill was unable to take care of her personal finances. When asked the basis of that opinion, Dr. Perkins testified that

> A. Just she seemed to need assistance with her [sic]. In my limited interaction with her at the clinic, she needed assistance with being brought to the clinic, with ambulation, with – even with our discussions with asking her questions, it was very limited responses that we would have.
>
> Q. Was her mental capacity good?
>
> A. It didn't seem to be. It seemed to be impaired.
>
> Q. As far as her memory, were you able to determine whether or not her memory was good?
>
> A. She would respond to me and ask me about my children, so there were – she would have some memory. I never got into detail about specific testing of her memory, but based on our conversations, it was impaired.
>
> Q. Is that something that's consistent with someone suffering from dementia?
>
> A. Very consistent.

¶33. Dr. Perkins acknowledged that Colburn was the person who brought Hill to see him, and that he did not have any concerns about Colburn. When asked by Colburn's attorney if it was possible that Hill was "lucid enough" to make decisions during the time period described in the indictment, Dr. Perkins said he "[could not] say that personally." Dr. Perkins testified that dementia is a progressive illness and that there may be "more lucid" moments, generally speaking, but that he could not say specifically for Hill.

17

¶34. Trustmark Bank employee Doug Winstead testified that he was a regional security officer responsible for "protecting the assets of the company and its customers." Winstead began looking into Hill's account in November 2012 after he got a phone call from another department "concerning a reclamation that was made on her account."[8] During his investigation he "discovered some irregularities," which prompted him to notify the Attorney General's Office. The "irregularities" that Winstead found were "[p]ersonal checks coming out of [Hill's] account to an individual that were going back to another bank [Colburn's Regions Bank individual account] that were for – noted for expenses."

¶35. Winstead also noticed "some rather large checks that were payable to another bank, which indicated the closing of her [Hill's] accounts at Trustmark and the funds being diverted over to Community Bank." Through Winstead's testimony, the State introduced Exhibit 1, which showed a $20,000 check, dated May 14, 2012, drawn on Hill's Trustmark

---

[8]Winstead explained that Colburn had called Trustmark when Hill's account had a negative balance, which had started the entire chain of events. Winstead explained how Hill's account had become overdrawn:

> Well, he [Colburn] had deposited the [social security] check into her [Hill's] account, but somewhere along the way, it appears that she didn't touch the check; therefore, [she] signed the affidavit of forgery on the check because she, in her mind, had never seen the check or signified her endorsement on the back of the check . . . these complaints go through the federal government, which in turn hits us [Trustmark] with a reclamation once the forgery is made, letting us know that they're charging us with the amount of the check based on the forgery. We didn't know who it was . . . once we were able to do a past history of this check and saw that it went into her account, well, we debited the account based on forgery, because they had debited us. So in order for us to get the money that had been taken from us, we took it from the account, which threw the account into the negative, which prompted the call by Greg Colburn to the bank as to what's going on . . . ."

18

account, payable to Community Bank, and deposited by Colburn into his personal account. State's Exhibit 2 showed a $125,000 check, dated April 10, 2012, drawn on Hill's Trustmark account, payable to Community Bank, with the memo line reading "New Checking Acct."

¶36. State's Exhibit 3 showed a $1,500 check, dated February 15, 2012, drawn on Hill's Trustmark account, payable to Colburn, with the memo line reading "Exp Reimbursement Oct-Dec [20]11." State's Exhibit 4 showed a $1,500 check, dated March 27, 2012, drawn on Hill's Trustmark account, payable to Colburn, with the memo line reading "Exp-Jan, Feb, March," deposited by Colburn into The Men of Music, LLC's account.[9] Winstead testified that, to his knowledge, Hill's Trustmark accounts had been closed and that she no longer had any money there. Winstead testified that he had never spoken personally to Hill or Colburn, and that the check memos were the only thing that indicated what the checks were for and the intent behind them; he had "no idea" whether Hill intended for Colburn to complete the transactions or not. When asked by Colburn's attorney if the transfers were "abnormal," Winstead said "[b]ased on what I saw in this particular case, it was abnormal in my opinion."

¶37. Community Bank records custodian Christy Jones testified that part of her employment responsibilities included watching for "suspicious activity." Through Jones's testimony, the State introduced Exhibit 5, which showed an opening deposit of $125,000 for a joint account between Colburn and Hill, dated April 10, 2012. State's Exhibit 6 showed the May 14, 2012, purchase of a $75,000 CD from the joint account, which was then put

---

[9]All of the checks in State's Exhibit 1-4 were signed by Ruby Hill, and two of the checks also were signed by Colburn as POA. So all of the transactions appeared to be facially valid.

solely in Colburn's name after the purchase. Jones testified that Hill would have no access to the CD, and that the CD would go to Colburn's estate should he pass away.

¶38. State's Exhibit 7 was a $1,500 check, dated June 5, 2012, made payable to cash, drawn on Hill and Colburn's joint account, signed by Colburn. State's Exhibit 8 was a $1,500 check, dated August 21, 2012, made payable to cash, drawn on Hill and Colburn's joint account, signed by Colburn. The memo line read "Reimbursement June, July August." State's Exhibit 9 showed a check payable to Hill from AXA Equitable Life Insurance Company for $3,440 (that Hill endorsed), which Colburn deposited into his personal account on February 22, 2012. State's Exhibit 10 showed a check for $52,209.93 from "Federated Gov Income Securities - F" payable to "Gregory Wayne Colburn POA, FBO[10] Ruby Frances Hill," which Colburn deposited into his personal account on May 10, 2012. And finally, State's Exhibit 11 showed a check for $3,931.31 drawn from the Bank of Forest payable to Ruby Hill, which Colburn deposited into his personal account on August 22, 2012.

¶39. Jones testified that she had reviewed the bank statements related to Hill's and Colburn's joint account. Jones said that there was the initial $125,000 opening deposit, and that there were various other deposits after that, totaling $82,000, that all came from Hill's personal account at Trustmark. Jones testified that Colburn never deposited anything in the joint account as the "maker"; all of the deposits were either from Hill, or payable to Hill. When asked specifically about several of the exhibits by Colburn's counsel, Jones acknowledged that, because Hill either signed personally, or because Colburn signed as joint

---

[10]"For benefit of."

account-owner or as Hill's POA, there was nothing facially improper or illegal about the transactions. Jones also testified that she did not file a report with anyone regarding the joint account.

¶40. Investigator Russell Frazier of the Attorney General's Office testified that he investigates cases involving allegations of exploitation of vulnerable adults. Frazier became involved with Hill's case after Trustmark Bank contacted the Attorney General's Office regarding some "unusual financial transactions." Frazier subpoenaed records from Trustmark Bank and Community Bank, and he also spoke with Hill in her room at Heritage House the same day that Winstead had called to report the suspicious financial activity. Frazier went to speak with Hill about the allegations and to "get her input on what's going on and kind of get a feel of what her mental capacity was and if she was okay with all these transactions that had happened." But Frazier ultimately spoke to Hill for less than ten minutes. When asked why he cut the interview short, Frazier responded

> Well, I started off – I just kind of wanted to get the framework, because the only thing we knew was that [Colburn] was a non-family member, so I had to kind of figure out what was this relationship, and then I wanted to find out about these financial transactions that took place. I started off by just asking her, tell me about your relationship with Greg Colburn and how long you've known him. And she told me, oh, I've known Greg for a long time . . . I said, well, how did you meet him and exactly how long [have] you've known him, and she couldn't tell me. And then I said, well, you know, I'm here today, [and] I want to ask you about this account that got opened at Community Bank with you and [Colburn], this joint account. And she told me she didn't have a joint account at Community Bank and didn't have any account with [Colburn]. So I said, okay. So I had several checks that had been provided to me by Trustmark that were made out to [Colburn], and I kind of asked her can you tell me what the checks were for, and she couldn't recall what the checks were for. And at that point, I cut the interview off. And I found out who her medical doctor was to verify my suspicion.

21

¶41. Frazier testified that he interviewed Colburn on December 10, 2012. Frazier said that Colburn spoke to him willingly, and that Colburn responded to his questions. Colburn told him that he had met Hill about twenty years ago, and that he had become her primary caregiver. When asked about the $125,000 check that came from Hill's personal Trustmark account into the Community joint account, Colburn said that Hill told him to move the money because Trustmark was "having a problem recognizing the power of attorney." Colburn recommended Community Bank—his bank—and Hill agreed. Colburn did not want to be on the joint account, but Hill "insisted it was going to be a joint account."

¶42. Colburn later suggested to Hill that she move some of that money into a CD, and Hill agreed. When asked why he put the CD in his name, Colburn said that "it must have been a mistake, because the CD was supposed to be in both of their names." Colburn said that Hill was not present when he opened the CD, but he was going to "make sure" that her name was added to it. Frazier testified that Colburn used the CD as collateral to obtain a $60,000 personal loan shortly after he purchased it.

¶43. Frazier asked Colburn if he had ever transferred any of Hill's money from her Trustmark account into his personal account, and Colburn said that he "may have put a few hundred dollars in there for running some errands and stuff." But when asked specifically about the $20,000 check that he had deposited into his personal account—State's Exhibit 1—"that's when he explained that – that's what she [Hill] wanted to do with the money." When asked about a $15,000 Met Life transaction,[11] Colburn testified that that money went

---

[11]It does not appear that the "Met Life transaction" was entered as an exhibit.

into their joint account. But after Frazier told him that the bank records showed that money went to the Men of Music, Colburn stated "that's [where] Ms. Hill wanted the money to go." Similarly, when asked about the AXA transaction—State's Exhibit 9—Colburn said that money went into their joint account. But when Frazier told him the bank records indicated that money was deposited into his personal account, Colburn "advised [that] Ms. Hill wanted him to have it as a gift."

¶44. When Frazier asked Colburn about the $52,000 federal government income securities check—State's Exhibit 10—Colburn

> originally stated he put the money in Ms. Hill's checking account. And when we explained to him that it indicated the money had actually been deposited into his personal account, he explained that it must have been a mistake or he made a mistake. And, you know, at this point we asked him, you know, how do you make a mistake by putting $52,000 into your account and not recognize its [sic] there, and he told me he only checks his accounts like once a year.
>
> Q. Did you ask him about the purchase of a tour bus?
>
> A. I did. I noticed in this same month in his bank records, it appeared a tour bus had been bought for $112,000. And I told him it was obvious to me that the $52,000 was used to buy the tour bus, and he denied that he used the $52,000 to buy the tour bus.[12]

¶45. The State rested after Frazier's testimony, and Colburn moved for a directed verdict, which the trial judge denied. Colburn then presented several witnesses who testified about his and Hill's loving and caring relationship and about Hill's demeanor when she executed the power of attorney and during some of the transactions at issue. Finally, Colburn took the

---

[12]Mark Carman testified during Colburn's defense. He met Colburn through the music industry, and he testified regarding Colburn's tour bus: "It's my understanding that somewhere in the neighborhood of $50,000 or a little bit more of it [the purchase price] came from Mrs. Ruby."

23

stand in his own defense. When asked how he felt about Hill, Colburn said "Oh, I love her with all my heart. I would do anything and everything in the world to make sure that she's taken care of and I feel that I have." Colburn testified that Hill had given him gifts in the past; she once gave him $18,000 to cover medical bills, and she also gave him $10,000 for a down payment on a car. She also would give him up to $1,000 sometimes before he would go on his singing trips to help cover his travel expenses. He testified that Hill wanted him to have the $20,000 and the $52,000 as gifts to support his music ministry. He could not recall a lot of what he told Investigator Frazier during his interview, but he testified that he was suffering from a diabetic episode during the interview. Both sides finally rested after Colburn's testimony.

¶46. So as mentioned above, several witnesses testified that Colburn and Hill appeared to have a loving and caring relationship, and that Hill seemed to "know what she was doing" during some of the banking transactions. But the State also presented evidence of Hill's poor mental state from both Dr. Perkins and Investigator Frazier. Winstead testified that he had observed "irregularities" in Hill's account that had caused him to investigate further, and that he regarded the transactions at issue as "abnormal." Hill told Frazier that she knew Colburn, but she said she did not have a joint account with him, nor could she remember what the checks Frazier showed her were for. And perhaps most importantly, Colburn changed his story about several of the financial transactions, both during his interview with Frazier, and between the time he talked with Frazier and when he testified at trial. Based on the evidence

24

the State presented, we find that a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Fagan*, 171 So. 3d at 503.

¶47. Colburn's argument that "no crime was committed" because he had Hill's POA, and because there was testimony of a loving relationship and that Hill "knew what she was doing" during some of the banking transactions is unavailing. Simply put, his argument stops short of a full analysis of the elements of exploitation. Hill could have been perfectly lucid and intentional in opening an account—i.e., she could have given her consent—but if the jury believed that Colburn had used "deceit, power, or persuasion" to influence Hill to act "without adequate attention to the consequences," then he obtained her consent by undue means, which also is an "improper" use under the Act.

¶48. Specifically, Count I alleged that Colburn exploited Hill by depositing checks made payable to her into his personal checking account. Colburn deposited a $52,209.93 check from Federated Gov Income Securities—payable to the order of "Gregory Wayne Colburn POA FBO Ruby Frances Hill"—into his personal checking account. And, using a power of attorney, he endorsed the check. The power of attorney specifically prohibited Colburn from gifting or assigning any of Hill's assets to himself. So the jury's verdict on Count I is supported by evidence that he deposited this check into his personal account without consent.

¶49. Count II alleged that Colburn exploited Hill by using funds in their joint checking account "for his own profit or advantage." Reasonable jurors could conclude that Hill decided to create the joint checking only so that Colburn could better manage her financial affairs. But Colburn persuaded Hill to use some of that money to obtain the CD, which he

25

put in his name, and then used as collateral to obtain a loan. Jurors certainly could conclude that Hill did not consent to this use. They also could conclude that Colburn persuading Hill to obtain a CD constituted undue means.

¶50. Stated differently, even assuming that the jury believed absolutely all of the facts that Colburn highlights on appeal—including his and Hill's close relationship—that would not necessarily absolve him of liability. We find that, based on the evidence produced by the State, the jury properly could have found that Colburn used that close relationship and other forms of persuasion to gain Hill's consent to the financial transactions. Indeed, that seemed to be the State's theory of the case. During opening statements, the prosecutor said that Colburn "befriended" Hill. "He doted on her, and he took her money." The jury also could have concluded that certain transactions lacked Hill's consent altogether. In short, after viewing the evidence in the light most favorable to the State, we find that a rational juror could have found the essential elements of the crime beyond a reasonable doubt. We therefore find that the State presented sufficient evidence to support Colburn's convictions.

### 4. The trial judge did not err in his evidentiary rulings.

¶51. Colburn was prepared to call Dr. Richard A. Roper, a purported handwriting expert. Roper had examined four documents and had prepared a report, about which he was prepared to testify, outlining his expert opinion that the four documents were signed by the same person. Two of the documents, the general power of attorney and the advance directive, were introduced into evidence during the notary's testimony, and she testified that it was indeed Hill who had signed the documents. The third document was a will, dated several

26

years before the indictment, which named Colburn as executor and sole beneficiary of Hill's estate. The fourth document was a handwritten letter, purportedly from Hill to Colburn, which expressed gratitude to him for visiting her and keeping in touch via telephone, among other things. Colburn wished to introduce the will and the letter and have Dr. Roper opine that Hill had signed all the documents.

¶52. But the trial judge excluded the will and the letter,[13] finding them irrelevant, cumulative, potentially confusing to the jury, and that their probative value was substantially outweighed by their prejudicial effect. Specifically, the trial judge stated that

> the mere fact that a victim has executed a will leaving her estate to the defendant upon her death is not really probative on the issue of whether or not that defendant took money before she died. Those are two separate and distinct matters, and to allow that kind of testimony in, I think might be confusing to the jury . . . . I think the issue is [whether to allow Colburn to present evidence that Hill] was going to leave everything to [him] at her death – and therefore, it showed [their] relationship. I believe that would be just confusing to the jury whenever a defendant, if they've known each other 24 years, has the ability to put forth his relationship with the victim through other evidence . . . I think that could be confusing to the jury, and you can prove that close relationship through other testimony.

¶53. Colburn argues that the trial judge erred, claiming that this evidence "would have assisted the jury in understanding the true nature of the relationship between [him] and Ms. Hill . . . ." The State counters that "the relationship between Colburn and Ms. Hill is not relevant to the issue of whether he exploited her" and that it "would not help the jury in

[13]It does not appear that the trial judge made a ruling specifically about Dr. Roper's testimony, but it is clear from the transcript that the exclusion of the will and letter obviated the need for his testimony.

determining any element of the crime or defense to this crime and could possibly confuse the jury regarding the issues."

¶54. This Court reviews evidentiary rulings under an abuse-of-discretion standard, and "will not reverse a trial court's evidentiary ruling absent a finding of abuse of discretion 'so as to be prejudicial to the accused.'" *Ronk v. State*, 172 So. 3d 1112, 1132 (Miss. 2015). After hearing argument from both sides, the trial judge decided to exclude the evidence and gave clear reasons for his ruling. And after careful review, we cannot say that the trial judge abused his discretion. This issue is without merit.

### 5. The trial judge did not err in admitting into evidence a photograph of Hill.

¶55. Colburn argues finally that the trial court should not have allowed a photograph of Hill to be introduced as evidence. He argues that it was irrelevant and prejudicial, because it was taken more than two years after the incidents alleged in the indictment and because it showed Hill in a wheelchair. He claims that "[t]he sole purpose of these photographs were to manipulate the emotions of the jurors which unjustly prejudiced [his] defense . . . ."

¶56. This Court has held that "[t]he admissibility of photographs rests within the sound discretion of the trial court." *Keller v. State*, 138 So. 3d 817, 857 (Miss. 2014). Photographs may be relevant even if all they do is "supplement or clarify witness testimony." *Id.* at 857 (quoting *Le v. State*, 913 So. 2d 913, 955 (Miss. 2005)). And "'[t]he discretion of the trial judge runs toward *almost unlimited admissibility regardless of* the gruesomeness, repetitiveness, and *the extenuation of probative value*.'" *Noe v. State*, 616 So. 2d 298, 304 (Miss. 1993) (citation omitted) & (emphasis added).

28

¶57. We find no abuse of discretion here. First, the trial judge noted when he ruled the photograph admissible that if Hill was physically able to be in the courtroom, "she would be seen by the jury as she is today, not as she was the day the crime was allegedly committed." Additionally, as mentioned above, it is undisputed that Hill was a resident of a care facility—a fact known to the jury—and therefore a "vulnerable person" under the Act.

¶58. Also as mentioned above, the trial judge previously had declared a mistrial because "two jurors reported a conflict in the case." Here, the State argued that, because of the previous mistrial, the photograph "would be relevant to a jury to be able to put a face to the victim listed in the indictment that they were going to hear about all throughout the trial." And this Court previously has held that a photograph of the victim "served a meaningful evidentiary purpose in establishing the identity of the man shot," even after the defendant offered to stipulate to the victim's identity. *See Noe*, 616 So. 2d at 303. *See also Campbell v. State*, 749 So. 2d 1208, 1213 (Miss. Ct. App. 1999) ("The photograph served the purpose of establishing the identity of the victim of the crime . . . . The victim does not need to remain faceless to the jury.").

¶59. Moreover, even assuming that Colburn is correct that the photograph "unfairly prejudiced the jury," we still would not reverse. For "[a] party may claim error in a ruling to admit or exclude evidence *only if the error affects a substantial right of the party*[.]" Miss. R. Evid. 103 (emphasis added). And we find no "substantial right" of Colburn's affected by the photo's admission, especially since Hill could have been present in the courtoom had she been physically able to do so. This issue is without merit.

29

## CONCLUSION

¶60. For the foregoing reasons, we find that all of Colburn's arguments lack merit, and we therefore affirm the judgment and sentences of the Rankin County Circuit Court.

¶61. **COUNT I: CONVICTION OF EXPLOITATION OF A VULNERABLE ADULT AND SENTENCE OF TEN (10) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF EXPLOITATION OF A VULNERABLE ADULT AND SENTENCE OF TEN (10) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCE IN COUNT II SHALL RUN CONSECUTIVELY TO THE SENTENCE IN COUNT I. APPELLANT SHALL PAY COURT COSTS, FEES AND ASSESSMENTS IN THE AMOUNT OF $1,031.50, RESTITUTION IN THE AMOUNT OF $78,000 IN COUNT I AND RESTITUTION IN THE AMOUNT OF $79,581.24 IN COUNT II. COURT COSTS, FEES AND ASSESSMENTS IN THE AMOUNT OF $1,031.50 IS TO BE PAID OUT OF THE APPELLANT'S CASH BOND ON DEPOSIT WITH THE CIRCUIT CLERK OF RANKIN COUNTY, MISSISSIPPI, AND THE REMAINING BALANCE OF $2,518.50 IS TO BE APPLIED TO RESTITUTION IN COUNT I. REMAINING RESTITUTION SHALL BE PAID WITHIN NINETY (90) DAYS FROM AUGUST 19, 2014. THE PAYMENT OF COURT COSTS, FEES, ASSESSMENTS, AND FINES PROVIDED ABOVE OR BY OTHER ORDERS OF THE COURT ARE TO BE MADE A SPECIAL CONDITION OF PAROLE OR ANY OTHER FORM OF EARLY RELEASE THAT MAY BE GRANTED TO APPELLANT. APPELLANT SHALL RECEIVE CREDIT FOR TIME SERVED IN PRETRIAL DETAINMENT AGAINST THIS SENTENCE.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., KING, COLEMAN, MAXWELL AND BEAM, JJ., CONCUR. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

**KITCHENS, JUSTICE, DISSENTING:**

¶62. Because Counts I and II of Colburn's indictment were insufficient to apprise him of the crime for which he was accused, I respectfully disagree with the majority's conclusion that the trial court correctly denied the motion to quash.

30

¶63. Uniform Rule of Circuit and County Court Practice 7.06 sets forth the requirements for the contents of a sufficient indictment:

> The indictment upon which the defendant is to be tried shall be a plain, concise and definite written statement of the essential facts constituting the offense charged and shall fully notify the defendant of the nature and cause of the accusation. . . .

URCCC 7.06. Such requirements are fundamental, rooted in both federal and state constitutions. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation . . . ."); Miss. Const. art. 3, § 26 ("In all criminal prosecutions the accused shall have a right . . . to demand the nature and cause of the accusation . . . .") "'[T]he purpose of the indictment is to provide the accused reasonable notice of the charges against him so that he may prepare an adequate defense.'" ***Warren v. State***, 187 So. 3d 616, 621 (Miss. 2016) (quoting ***Brawner v. State***, 947 So. 2d 254, 265 (Miss. 2006)). We have held that the "'indictment must contain (1) the essential elements of the crime charged, (2) sufficient facts to fairly inform the defendant of the charge which he must defend, and (3) sufficient facts to enable him to plead double jeopardy in the event of a future prosecution for the same offense.'" ***Warren***, 187 So. 3d at 621 (quoting ***Young v. State***, 119 So. 3d 309, 313 (Miss. 2013)).

¶64. Count I of the indictment alleged that:

> Gregory Wayne Colburn between February 1, 2012 and August 31, 2012 in the County and State aforesaid and within the jurisdiction of this Court, did wilfully, unlawfully, feloniously, knowingly, and intentionally exploit Ruby Hill, a vulnerable adult as defined by Section 43-47-5(n) of the Mississippi Code of 1972, as amended, and with knowledge that Ruby Hill's ability to perform normal activities of daily living *or* to provide for her own care or protection from abuse, neglect, *or* exploitation was impaired due to mental,

31

emotional, physical *or* developmental disability *or* dysfunction, *or* brain damage *or* the infirmities of aging, did exploit Ruby Hill, by the illegal *or* improper use of Ruby Hill's resources, in an amount over two hundred fifty dollars ($250.00) for his own profit or advantage, with *or* without the consent of Ruby Hill, including acts committed pursuant to power of attorney, by depositing checks made payable to Ruby Hill into his personal Community Bank account . . . in violation of M.C.A. Section 43-47-19 of 1972, as amended . . . .

(Emphasis added.) Count II likewise alleged that:

Gregory Wayne Colburn between May 1, 2012 and August 21, 2012 in the County and State aforesaid and within the jurisdiction of this Court, did wilfully, unlawfully, feloniously, knowingly, and intentionally exploit Ruby Hill, a vulnerable adult as defined by Section 43-47-5(n) of the Mississippi Code of 1972, as amended, and with knowledge that Ruby Hill's ability to perform normal activities of daily living *or* to provide for her own care or protection from abuse, neglect, or exploitation was impaired due to mental, emotional, physical *or* developmental disability *or* dysfunction, *or* brain damage *or* the infirmities of aging, did exploit Ruby Hill, by the illegal *or* improper use of Ruby Hill's resources, in an amount over two hundred fifty dollars ($250.00) for his own profit or advantage, with *or* without the consent of Ruby Hill, including acts committed pursuant to power of attorney, by creating a Community Bank account . . . in the name of "Ruby Francis Hill or Gregory Wayne Colburn," and then transferring funds belonging to Ruby Hill into the account, and using these funds for his own profit or advantage in violation of M.C.A. Section 43-47-19 of 1972, as amended . . . .

(Emphasis added.) Colburn was acquitted on Count III of the indictment.

¶65. The majority concludes that Colburn was, in fact, provided adequate notice of the charges against him because "Colburn knew the statute he was charged with violating" and "[h]e knew the date ranges, the transactions, the banks, the account numbers, and the alleged victim of the crimes charged." (Maj. Op. ¶ 24). But the indictment is laden with layer upon layer of disjunctive phraseology.

32

¶66. First, Colburn was informed that he exploited Hill "with knowledge that Ruby Hill's ability to perform normal activities of daily living *or* to provide for her own care or protection from abuse, neglect, *or* exploitation was impaired due to mental, emotional, physical *or* developmental disability *or* dysfunction, *or* brain damage *or* the infirmities of aging . . . ." (Emphasis added.) Mississippi Code Section 43-47-19(2)(b) does not even require that the defendant be in possession of knowledge of the alleged victim's vulnerability; it requires merely that the defendant "willfully exploit[] a vulnerable person . . . where the value of the exploitation is Two Hundred Fifty Dollars ($250.00) or more." Miss. Code. Ann. § 43-47-19(2)(b) (Rev. 2015). While it is true that the indictment tracked the statutory language defining "vulnerable person," the indictment does not allege that Hill was a "resident[] or patient[], regardless of age, in a care facility." Miss. Code Ann. § 43-47-5(q) (Rev. 2015).  The State proved, though it did not allege in Colburn's indictment, that Hill resided in a care facility. The jury was instructed that "'vulnerable person' . . . includes all residents or patients, regardless of age, in a care facility." The indictment, therefore, did not allege "sufficient facts to fairly inform the defendant" of what it intended to prove with regard to Hill's status as a vulnerable person within the meaning of Section 43-47-5(q).

¶67. Second, the indictment alleged that Colburn exploited Hill "by the illegal *or* improper use of Ruby Hill's resources." (Emphasis added.) "Illegal use" is defined as "any action defined under Mississippi law as a criminal act." Miss. Code Ann. § 43-47-5(j) (Rev. 2015). "Improper use" is defined as follows:

> [A]ny use without the consent of the vulnerable person, any use with the consent of the vulnerable person if the consent is obtained by undue means, or

> any use that deprives the vulnerable person of his ability to obtain essential services or a lifestyle to which the vulnerable person has become accustomed and could have otherwise afforded.

Miss. Code Ann. § 43-47-5(k) (Rev. 2015). Colburn would be wholly unable to ascertain from the face of the indictment of which course of criminal conduct he was being accused, whether he was being accused of the *illegal use* or the *improper use* of Hill's resources. It is difficult to conclude that the disjunctive language of the indictment provided "sufficient facts to fairly inform the defendant of the charge which he must defend."

¶68. Finally, in the same vein, the indictment alleged that Colburn used Hill's resources "with *or* without the consent of Ruby Hill . . . ." It is true that such language tracks the statutory language from Section 43-47-5(k). But, again, the indictment does not explain which course of criminal conduct Colburn was alleged to have committed, whether he used Hill's resources without her consent, whether he used Hill's resources with her consent, or both. Of course, if the State intended to prove improper use "with the consent of the vulnerable person," it had to allege that the consent was "obtained by undue means."[14] Miss. Code Ann. § 43-47-5(k). Undue means, an element of the crime of exploitation of a vulnerable adult, was not pled in the indictment for either Count I or Count II.

¶69. The majority cites *State v. Hawkins*, 145 So. 3d 636 (Miss. 2014), to argue that the State was not required to allege which type of "improper use" was being charged, because "this Court has not required that level of specificity in indictments." (Maj. Op. ¶ 25). But in

---

[14] The State did not attempt to prove "improper use" by its fourth definition, "any use that deprives the vulnerable person of his ability to obtain essential services or a lifestyle to which the vulnerable person has become accustomed and could otherwise have afforded."

*Hawkins*, the defendant was accused of having committed a simple assault on the victim by "'*willfully*, negligently[,] and feloniously'" inflicting "'pain and/or injury upon Deserie S. Edwards, a vulnerable person'" *Hawkins*, 145 So. 3d at 638 (emphasis added). This Court examined the statutory language of Mississippi Code Section 97-3-7(1) (Supp. 2013) and noted that "it is not clear if [the defendant] was charged under subsection (i) with 'purposely, knowingly[,] or recklessly' injuring [the victim] or under subsection (ii) with 'negligently' injuring [the victim], presumably by means other than a deadly weapon.'" *Id.* at 640.

¶70.    The Court deemed the inclusion of the word "willfully' in the indictment to have been mere surplusage because "the indictment clearly charged [the defendant] with simple assault" and "[t]he recitation of the relevant facts showed that [the defendant's] conduct was negligent." *Id.* at 641. The Court further held that "the State is not required to distinguish the subsections in every indictment so long as the indictment is sufficient to inform the defendant of the claims against him or her." *Id.* at 642. Of course, this Court relied upon caselaw holding that an indictment putting a defendant on notice that the charge was aggravated assault was sufficient to apprise the defendant that "he was being charged with aggravated assault under both subsections, i.e., by causing injury under circumstances manifesting extreme indifference to the value of human life and by causing bodily injury with a deadly weapon or other means likely to produce death or serious bodily harm." *Id.* at 643 (quoting *Stevens v. State*, 808 So. 2d 908, 919-20 (Miss. 2002)). This Court held in *Hawkins* that the same rationale applied in the context of simple assault and that the subsections, one requiring

intentional conduct and the other requiring negligence, were not mutually exclusive. *Hawkins*, 145 So. 3d at 643, 645.

¶71.   The present case presents a situation, unlike that in **Hawkins**, in which the courses of criminal conduct are, in fact, mutually exclusive. For Colburn's use of Hill's resources could have been either illegal *or* improper, not both. And each charged use of Hill's resources must have been either with *or* without Hill's consent, for if Hill's consent had been obtained, the State bore the additional burden of alleging that consent had been obtained by undue means. Here, due to the disjunctive wording of the indictment on multiple levels, I am unable to conclude that the alternative courses of criminal conduct constitute mere surplusage.

¶72.   Accordingly, I would reverse and render, and I respectfully dissent.